UNITED STATES of America,
Plaintiff-Appellee,

v.

Mark A. THIERMAN,
Defendant-Appellant.

No. 80–1852.

United States Court of Appeals,
Ninth Circuit.

Argued May 12, 1981.

Submitted Aug. 14, 1981.

Decided June 8, 1982.

Marshall D. Tandy, Tucson, Ariz., for defendant-appellant.

Rhonda L. Repp, Asst. U. S. Atty., Tucson, Ariz., for plaintiff-appellee; Gerald Frank, Asst. U. S. Atty., Tucson, Ariz., on brief.

Before CHOY and WALLACE, Circuit Judges, and WYATT,* District Judge.

CHOY, Circuit Judge:

Thierman was sentenced to five years imprisonment for burglarizing a post office building, 18 U.S.C. § 2115, and for several other offenses. His principal claim on appeal is that the admission of his confession violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny.[1] We affirm Thierman's convictions.

I

On May 1, 1980, the Pima County Sheriff's Department secured a warrant to search Thierman's apartment. Thierman was suspected of involvement in several crimes, including a credit-card fraud and four post-office burglaries. At about 11 p.m., while en route to Thierman's apartment to execute the warrant, Detective Barkman and Sergeant Pedersen saw Thierman driving in the opposite direction. They stopped Thierman, handcuffed him, and read him his *Miranda* rights. Thierman indicated that he understood his rights and, when asked by the police if he would waive them, said that the police could ask him questions and that he would respond to the ones he wanted to answer. In answering several questions about his apartment and his friends, Thierman appears to have given what are best characterized as half-truths.

The police then proceeded with Thierman to his apartment to execute the warrant. In the apartment, police found large rolls of postage stamps in amounts similar to those taken in the post office robberies, as well as equipment which had been used as part of the credit-card fraud. Subsequently, they were joined by inspectors of the United States Postal Service, who had obtained a federal search warrant. At about 2:40 a.m., one of the federal inspectors read Thierman his *Miranda* rights again and began to question him. Thierman stated that he did not mind talking but did not want to talk about the credit-card fraud.

Detective Barkman then informed Thierman that the police knew exactly what he had been doing and wanted to locate over $100,000 in money orders that had been stolen in the post-office burglaries. He told Thierman, in no uncertain terms, that, if Thierman did not start telling the truth, Barkman intended to continue his investigation until the money orders were located. Barkman told Thierman that the police would find the money orders with or without his help and would begin that night by talking to his girl friend, Pat, his family and his friends. When Thierman asked, "Can we talk about it tomorrow?," Barkman replied that he wanted the money orders that night because he did not want the money orders disposed of or lost. Thierman responded that he preferred to turn over the money orders the next morning after he had spoken with his attorney. As soon as Thierman mentioned his attorney, Barkman ceased the questioning and said to one of the other officers, "That's it, ... let's go talk to the girl."

As the officers turned to go, Thierman stopped them and told Barkman that he would turn over the money orders in the morning if Pat were left out of it. Thierman told Barkman that Pat did not have the money orders and was not involved.

* The Honorable Inzer B. Wyatt, United States District Judge for the Southern District of New York, sitting by designation.

1. Thierman also argues that there was no probable cause for his arrest, and that the search warrant pursuant to which the authorities searched his apartment was invalid. We find no merit in either of these contentions, and we reject them.

Barkman reiterated that he wanted the money orders that night. Thierman responded that he would lead them to the money orders if the police would promise not to prosecute the person who had them. This was followed by a lengthy conversation concerning the status of the person who had the money orders and whether some type of deal could be made. A telephone call was placed to an Assistant United States Attorney who agreed only to consider a recommendation by the police that the person not be prosecuted.

When Thierman learned that the police could not guarantee that the other person would not be prosecuted, he said that he wanted to call his lawyer. Although the record is not clear on the sequence of events that followed, it appears that Thierman's roommate had been present in the apartment until shortly before the police had called the United States Attorney when he left and called Thierman's lawyer. The roommate apparently told Thierman that the lawyer had recommended that Thierman remain silent until the next morning when the lawyer would contact Thierman.

Thierman then called his lawyer directly. Barkman told Thierman to advise his lawyer that police officers were present, and Thierman did so. After Thierman's conversation with his lawyer, either Thierman gave the telephone to Barkman or Barkman called the lawyer back. The attorney explained to Barkman that, although he was sympathetic with the officers' desire to secure the money orders that night, he had advised Thierman not to talk without an attorney present.

After the conversations with the lawyer, Thierman told the police that he was not going to talk until the next morning when his attorney was present. At that point, Barkman went to Pat's apartment to interrogate her.

Several officers remained behind in Thierman's apartment. The record shows that no one asked Thierman any questions. The officers discussed in Thierman's presence, however, that they were going to have to contact Thierman's family, friends and acquaintances about the case. During the course of the conversation, one of the officers apparently stated that it was too bad that Pat had to become involved.

After several minutes, Thierman told Pedersen that he would like to talk to Barkman again. Pedersen went to Pat's apartment and brought Barkman back. Barkman and Thierman spoke alone, in a separate room. Thierman wanted another explanation of the arrangement the United States Attorney had offered. He indicated again that he did not want to get anybody else in trouble, especially Pat. Thierman told Barkman that a woman had been involved in one of the robberies, but that it was not Pat. After some discussion involving this subject, Thierman stated that although his lawyer would "kill him," he would lead the police to the money orders, if it could be done "his" way.

After the police recovered the money orders from Thierman's brother, they took Thierman to the police station to give a statement. He made a taped statement at about 5:30 a.m., confessing to the burglaries for which he was subsequently charged and convicted. He indicated on tape that his statement was given voluntarily and without coercion. Later, however, he testified that he had lied about this to protect Pat, and that his statement had been "coerced" by the threat of Pat becoming a suspect in the case.

II

Thierman contends that his *Miranda* rights were violated because he was interrogated by the police after he had invoked his right to have counsel present, and because he was questioned after he had asserted his right to remain silent. After holding a hearing on the motion to suppress the confession and after examining, with the aid of supplemental briefs, the application of the then recently-decided *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1979), the district judge denied Thierman's motion to suppress his confession. The court held that the police officers' comments after Thierman had invoked his right

to counsel "merely reiterated the obvious," did not amount to any interrogation, and were even less evocative than those in *Innis.*

### III

■ We use the clearly-erroneous standard to review the district court's determination of whether police conduct subsequent to arrest constitutes "interrogation." *United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir. 1981). On this crucial factual determination which must be made in light of all the circumstances in the case, *id.,* we will not lightly substitute our judgment for that of the district judge, who can better evaluate the facts and the often conflicting inferences that may be drawn therefrom. After carefully reviewing the record, we cannot say that the trial court's determination is clearly erroneous. Rather, Thierman's confession appears to have been the result of an exchange initiated by him within the meaning of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).[2]

### IV

In *Miranda,* the Supreme Court determined that the Constitution requires custo-

dial interrogation to be preceded by, *inter alia,* advice to the accused of the right to remain silent and also of the right to have an attorney present during interrogation. 384 U.S. at 479, 86 S.Ct. at 1630. If an accused indicates a desire to remain silent, the interrogation must cease; if an accused requests counsel, the interrogation must cease until his attorney is present. *Id.* at 473–74, 86 S.Ct. at 1627–28. However, *Miranda* does not mean that once these rights are asserted that they may not be waived later. *See Edwards v. Arizona,* 451 U.S. at 484, 101 S.Ct. at 1884; *United States v. Skinner,* 667 F.2d 1306, 1309 (9th Cir. 1982).

■ Interrogation includes not only express questioning by police but also its functional equivalent, *i.e.,* "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1979). Thus, police statements or actions constitute interrogation unless they were either not reasonably likely to elicit an incriminating response or normally attendant to arrest and custody.[3]

2. In *Edwards,* the Supreme Court held that "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. at 1884–85. Thierman invoked his right to counsel but reinitiated the conversation when he requested to speak to Barkman again. Thus, any subsequent interrogation that led to Thierman's confession fell outside the reach of *Edwards.*

3. The Supreme Court has not given any guidance concerning what police activities are normally attendant to arrest and custody. This court has held that *Miranda* does not preclude officers, after a defendant has invoked his *Miranda* rights, from informing the defendant of evidence against him or of other "circumstances which might contribute to an intelligent exercise of his judgment." *United States v. Rodriguez-Gastelum,* 569 F.2d 482, 486–88 (9th Cir.), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978). For example, this circuit has upheld the admission of statements

made after a suspect's assertion of *Miranda* when an officer informed a suspect of new charges being brought against him, *United States v. Wilson,* 571 F.2d 455, 456 (9th Cir. 1978); when an officer explained to a suspect the extensive evidence against him, *United States v. Pheaster,* 544 F.2d 353, 368 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); and when an FBI agent showed the suspect a picture of himself participating in a bank robbery and asked whether the suspect wanted to reconsider whether he wanted counsel present. *United States v. Davis,* 527 F.2d 1110, 1111 (9th Cir. 1975), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 196 (1976). While these cases were decided before *Innis,* they seem to say that informing a defendant of circumstances which contribute to an intelligent exercise of his judgment is normally attendant to arrest and custody. Because we find it is not clearly erroneous for the district court to conclude that the police comments did not constitute the functional equivalent of interrogation, however, we need not decide what activities are normally attendant to arrest and custody.

Although courts focus primarily on the perceptions of the suspect in determining whether police action is reasonably likely to elicit an incriminating response, the intent of police is not irrelevant. *See Booth,* 669 F.2d at 1237. "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 301–02, 100 S.Ct. at 1690.[4]

The Supreme Court has not denoted what factors should be examined in determining the perceptions of a suspect, but in *Innis* it focused on the suspect's peculiar susceptibility to the police appeal and on whether the police knew that the respondent was unusually disoriented or upset. *Id.* at 302–03, 100 S.Ct. at 1690–91. Although these are but two factors for determining the perceptions of the suspect, they, along with the general circumstances in which the statement was made, are sufficient to dispose of this appeal.

By holding in *Innis* that police statements that acted as subtle compulsion did not constitute interrogation, the Supreme Court appears to have narrowly construed what is reasonably likely to elicit an incriminating response. In *Innis,* three officers transporting a murder suspect to the police station began conversing about the possible location of the sawed-off shotgun used in the killing of a taxicab driver. The suspect had been given his *Miranda* warnings and had stated that he wanted to speak to a lawyer. The officers had been told by their captain not to question the suspect. During the drive, one officer commented that he regularly patrolled the area where the suspect had been arrested and that, because a school for the handicapped was nearby, he hoped a handicapped child would not find the gun and hurt herself. Another patrolman commented that, because of the safety

factor, the officers should continue to search for the weapon. The patrolmen clearly knew that the suspect could hear the conversation. After one officer said that it would be too bad if a little girl picked up the gun and killed herself, the suspect interrupted the conversation and asked the officers to turn the car so he could show them where the gun was hidden. *Id.* at 294–95, 100 S.Ct. at 1686–87.

## V

Thierman claims that the district court erred in admitting his confession because the police failed to respect his assertion of the right to remain silent and interrogated him after he had asserted his right to counsel.

### A. *Thierman's Right to Remain Silent*

 The record supports the district court's conclusion that Thierman knowingly and voluntarily waived his right to remain silent. Twice Thierman was advised of his *Miranda* rights and each time he agreed to answer some questions and refused to answer questions on certain topics. A person in custody may selectively waive his right to remain silent by indicating he will respond to some questions, but not to others. *United States v. Lopez-Diaz,* 630 F.2d 661, 664 n.2 (9th Cir. 1980); *United States v. Lorenzo,* 570 F.2d 294, 297–98 (9th Cir. 1978). Through the exercise of the option to terminate questioning, a suspect can control the subjects discussed, the time at which questioning occurs, and the duration of the interrogation. *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). Thierman chose only to limit the subjects to be discussed and there is no evidence in the record that the police did not completely respect that limitation.

 The only other event relevant to whether Thierman invoked his right to remain silent occurred when he inquired,

---

4. Police practices designed to elicit an incriminating response will normally be deemed interrogation. *Innis,* 446 U.S. at 301–02 n.7, 100 S.Ct. at 1690. Thierman does not suggest and there is no evidence that the conversation at issue in this case can be properly characterized as a police *practice.*

"Can we talk about it tomorrow?" The district judge was not required to interpret Thierman's question as an invocation of his right to remain silent. The question is more easily construed as a mere request to postpone interrogation on a single subject than an outright refusal to answer any more questions.

## B. *Thierman's Right to Counsel*

Our review of Thierman's claim that the police interrogated him in violation of *Miranda* begins with Thierman's second assertion of his right to have counsel present.[5] This assertion came immediately after Thierman's unsuccessful attempt to secure a "deal" to his liking. He had telephoned his lawyer and then told the police that he would not talk further with them until the next morning when his attorney was present. The record shows that Barkman and the officers then immediately ceased questioning him. Thus, the issue is whether the officers' conversation in Thierman's presence about the likely course of their investigation and about the involvement of Thierman's girl friend constituted interrogation.

At the outset, it should be noted that the case is similar to *Innis*.[6] In both cases, the conversations were brief and concerned the likely course of the police investigation and the possible consequences of the suspect's failure to cooperate with the police. While there are some factual differences, Thierman has not persuaded us that they are significant enough to require a different result.

The major difference is Sergeant Pedersen's statement at the suppression hearing that by discussing, in Thierman's presence and after he had invoked his right to counsel, the need to involve Thierman's girl friend, Pedersen guessed he was trying to get Thierman to respond. This statement, Thierman argues, conclusively proves that the police intended for Thierman to incriminate himself and that, therefore, the police interrogated him in violation of *Miranda*.

We do not find this equivocal statement at all determinative. One could find, as the district court apparently did, that in light of the circumstances surrounding the officer's statements, the conversation did not constitute interrogation. There is nothing in the record to compel a finding that the police conversation was more evocative than the one at issue in *Innis*.

Thierman also argues that his concern about the involvement of his family and friends made him "peculiarly susceptible"

---

5. When Thierman first mentioned his attorney, the police immediately stopped their questioning. As they began to leave for his girl friend's apartment, Thierman reopened the dialogue. By initiating further discussion, he waived his right to be free from interrogation until his attorney was present. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

6. Thierman argues that the factual situation is more analogous to *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Edwards was arrested in his home and taken to the police station where he was informed of his *Miranda* rights. He stated that he understood those rights and was willing to talk with the police. Edwards denied involvement and asserted an alibi, and then told the police that he wanted to make a deal. After telephoning the county prosecutor and discussing what deal he might be able to make, Edwards informed the police that he wanted an attorney before "making a deal." The police then ceased their questioning. *Id.*, at 479, 101 S.Ct. at 1882. To this point, the cases are substantially similar.

The next morning, two detectives approached Edwards who had been taken to the county jail. Edwards stated that he did not want to talk to them, but was told by a detention officer that he "had" to talk. *Id.* The detectives identified themselves, informed Edwards that they wanted to talk to him, and read him his *Miranda* rights. Edwards said he was willing to talk and, after listening to part of a taped statement of an alleged accomplice who had implicated Edwards, confessed to the crime. *Id.* The Supreme Court held that this interrogation violated Edwards' right to have counsel present during custodial interrogation. *Edwards* is distinguishable in several respects. At no time after invoking his right to counsel was Thierman told that he "had" to talk. Furthermore, the police did not reinitiate the interrogation of Thierman; it was Thierman's idea, after he had carefully reflected upon the options available to him, to discuss once again the terms of the proposed deal. Finally, Edwards was held in custody overnight without counsel, a situation that would make custody even more coercive.

to the officers' conversation. It does appear that, throughout Thierman's dealings with police, he sought to keep his friends and family out of the investigation. Detective Barkman attempted to use that concern to persuade Thierman to tell the truth. Indeed, Barkman's statement that the officers were going to speak to Pat resulted in Thierman's decision to try to make a deal. Thierman had reason to be concerned about the potential involvement of his family and Pat: his brother had the $100,000 worth of stolen money orders in his possession, and Thierman had told police that a woman was involved in one of the robberies (although he had said it was not Pat).

We do not agree, however, that a concern about family and friends becoming involved in a criminal investigation creates a "peculiar susceptibility." Most people in Thierman's position would share his concern. Moreover, in light of his background, Thierman does not appear to have been a person easily susceptible to psychological pressures. Thierman was well-educated, a junior in college majoring in engineering, and also quite shrewd. During the course of the post-office robberies, he had been able to skirt post-office alarm systems. More importantly, once arrested, he recognized the importance of having a lawyer present and of negotiating a favorable deal.

While we do not believe that the Supreme Court meant the term "peculiar susceptibility" to have a very narrow reach, the words themselves indicate that the term should not be construed too broadly. On the facts in this case, it would be difficult to say that Thierman was peculiarly susceptible.

Finally, the record does not indicate that the police knew that Thierman was particularly upset or disoriented when they conversed in his presence. *See Innis*, 446 U.S. at 302–03, 100 S.Ct. at 1690–91. Thierman was allowed limited free movement in his apartment while in custody and his roommate was present during most of the time. He had been advised twice of his *Miranda* rights and on each occasion had indicated to the officers that he was willing to answer some questions but not others. This selective answering is a strong indication that Thierman was not particularly upset because it shows that he was attempting to use his *Miranda* rights to his advantage in negotiating with the police. There were also no intentional delays in providing Thierman with an attorney in the hope that he would yield to pressure and recant his demand for an attorney. *See Pheaster*, 544 F.2d at 368.

The only circumstance from which it might be inferred that Thierman was upset was that he had been in custody for nearly five hours when he decided to confess. Until shortly before his decision to confess, however, Thierman had been cooperating with the police, although in a limited manner, and answering questions.

In fact, Thierman's actions that night belie an argument that he was upset beyond what is normally incident to arrest. After overhearing the conversation in question, Thierman did not immediately make any incriminating statements, but rather sought a continued discussion of a "deal." Thierman confessed only after completely exploring the possibility of a deal, explaining to the police that he would lead them to the money orders if it could be done his way, and stating that he was going to act contrary to his attorney's advice. These actions do not appear to be those of a suspect who is particularly upset or disoriented.

## VI

We find that it was not clearly erroneous for the district court to conclude that the police comments did not constitute the functional equivalent of interrogation. The district court's judgment is AFFIRMED.

WALLACE, Circuit Judge, dissenting:

I do not lightly dissent from the majority opinion, for I am convinced that some courts, in their eagerness to effectuate fully the prophylactic safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (*Miranda*), often apply a principle "broader than that required to

implement the policy of *Miranda* itself." *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981). Nor am I persuaded that the Supreme Court's recent decision in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (*Edwards*), is necessarily required by *Miranda*; indeed, over four years ago I joined an opinion for this court sitting *en banc* which rejected a *per se* rule prohibiting waiver of the *Miranda* right to counsel closely analogous to the rule subsequently applied by the Court in *Edwards.* *See United States v. Rodriguez-Gastelum*, 569 F.2d 482, 483 (9th Cir.) (en banc), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978). However, I am obligated to apply the law as announced by the Supreme Court. Because I believe the majority has misapprehended the clear import of *Edwards* and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (*Innis*), I dissent.

The majority twice asserts that Thierman "initiated" the questioning within the meaning of *Edwards* by recalling Barkman from Pat's apartment. *Ante* at 1333–1334 & n.2, at 1335–1336 n.5. With all due respect, the majority's conclusion is overly hasty. *Edwards* emphasizes that "additional safeguards are necessary when the accused asks for counsel . . . ." 451 U.S. at 484, 101 S.Ct. at 1884. Accordingly, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* (footnote omitted). As I read *Edwards*, therefore, one cannot waive the right to counsel guaranteed by *Miranda*, once it has unequivocally been asserted, by "initiating" a discussion only in response to direct interrogation or to words or conduct that constitute the "functional equivalent" of express questioning within the meaning of *Innis.* Logically, one cannot initiate custodial interrogation merely by responding to custodial interrogation.

If the majority means that a suspect "initiates" a conversation under *Edwards* by knowingly and voluntarily offering to resume answering questions, after the right to counsel is invoked but before any subsequent "interrogation," then the majority is correct. But the conclusion that Thierman initiated the conversation with Barkman hinges upon the conclusion that Pedersen's comments and Barkman's conduct did not constitute interrogation. "Absent such interrogation, there would have been no infringement of the right that [Thierman] invoked and there would be no occasion to determine whether there had been a valid waiver. *Rhode Island v. Innis, supra*, makes this sufficiently clear." *Edwards*, 451 U.S. at 486, 101 S.Ct. at 1885. If, therefore, the "words or actions" of Barkman and Pedersen were of the type "that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689 (footnotes omitted), Thierman was impermissibly interrogated under *Edwards* and did not initiate the exchange with Barkman by agreeing to talk with him again.

It is on this point that I strongly disagree with the majority's reasoning. I conclude that the district court was clearly erroneous in determining that the conduct of the police after Thierman invoked his right to counsel did not constitute interrogation. The question presented is not, of course, whether the conversation in this case is more or less "evocative" than that in *Innis*; contrary to the majority's assumption, the *Innis* test focuses on whether the police reasonably should have known that their words or conduct were likely to elicit an incriminating response from the suspect himself. In other words, the evocative nature of the language used is measured not by its abstract qualities, but by its relation to what the police knew or, in the circumstances of a given case, should have known the suspect's reaction to it would be.

There can be no doubt that Barkman and Pedersen knew, or at least should have known, exactly what they were doing and therefore must be held to have intended that Thierman would confess in response to

their words and actions. The majority discounts Pedersen's later characterization of his comment that it was "too bad" that Pat, Thierman's girl friend, had to become involved, by labeling his characterization "equivocal." Far from it. At the suppression hearing, Pedersen was examined by Thierman's attorney and indicated that he had some "general conversation" with Thierman while Barkman went to question Pat. After first denying that the conversation had in any way concerned the missing money orders, Pedersen refreshed his recollection by reading his investigation report and admitted that he had, in fact, discussed the money orders with Thierman at that time. Pedersen and two fellow officers then "talked about him [Thierman] for possibly 10 or 15 minutes." During that conversation, there was some discussion that it was too bad that Pat and others had to be involved. Pedersen forthrightly admitted that this conversation occurred in Thierman's presence, that he looked at Thierman while speaking, and that he "meant for him to hear that." Finally, when asked whether he was "trying to get [Thierman] to respond to that," Pedersen answered, "Yes, I guess I was."[1] Viewed in their context, then, the statements of Pedersen are clearly not equivocal at all; having already admitted that he spoke in Thierman's presence while looking at him and intending for him to hear, Pedersen's last answer is as close to a direct admission that his comments were intended to induce a confession from Thierman as one may ever reasonably hope to come across.

This fact decisively sets this case apart from *Innis*, where the conversation was "nothing more than a dialogue between the

---

1. Pedersen was questioned at the suppression hearing as follows:

Q Sir, I'd like to ask a few questions concerning—you were present when Detective Barkman was interrogating Mr. Thierman; is that correct?

A I was in the apartment, not in the same room, during all of the time that Detective Barkman was questioning Mr. Thierman.

Q All right. You at some point came to realize that Barkman had ceased his interrogation and had gone down to see Pat Grogan; is that correct?

A Yes, sir.

Q And at that time you were in the apartment with Mr. Thierman, together with Mr. O'Brien and Mr. Zembledge?

A Yes.

Q And at that point in time you had some conversation with Mr. Thierman; is that correct?

A General conversation, yes.

Q And you questioned him about the whereabouts of money orders?

A No, I did not question him at this time.

Q You made a report in this case; did you not, sir?

A Yes, I did.

Q Did it say in your report that you had a conversation with Mr. Thierman concerning money orders?

A May I look at my report?

Q Certainly. It's page three.

A Yes, I did.

Q All right. And did you in fact do that or did you put something that was mistaken in your report?

A I had a conversation with him. I did not ask him any questions.

Q You had a conversation with him but you did not ask him anything?

A Yes, sir.

Q And the conversation was about the stolen money orders?

A Partially.

Q Well, you said in here that that was the center of the conversation.

A Part of the conversation, we talked about him for possibly ten or 15 minutes.

Q And you also, there was some discussion about it being too bad about involving Pat or some of these other people in this thing; do you recall having that discussion?

A Yes, I do.

Q And that was in the presence of Mr. Thierman?

A Yes.

Q Did you ever look at him when you said something like that?

A Yes.

Q You meant for him to hear that?

A Yes.

Q And you were trying to get him to respond to that; were you not?

A Yes, I guess I was.

Q And it was after—I believe you said this conversation went on for what, did you say ten minutes?

A With that and other topics, yes.

Q And it was during this period of time then that he said he wanted to speak to Barkman again, "Go get Barkman, I'll talk to him"?

A Yes.

MR. TANDY: All right. I don't have anything else.

R.T. 170–72.

two officers to which no response from the [suspect] was invited," 446 U.S. at 302, 100 S.Ct. at 1690, and where there was no suggestion in the record that the police intended their conversation to elicit an incriminating response. *Id.* at 303 n.9, 100 S.Ct. at 1690. Here there is. Indeed, the Court in *Innis* emphasized that "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 301–02 n.7, 100 S.Ct. at 1690. In short, this is not a case like *Innis* in which the suspect was confronted by some "subtle compulsion" by "a few offhand remarks" between police officers. *Id.* at 303, 100 S.Ct. at 1690–91. Rather, this is a case where the police capitalized on their knowledge that Thierman desperately wanted to protect Pat by deliberately attempting to secure a confession after Thierman had invoked his right to counsel. While Pedersen and the other officers remained with Thierman, attempting to persuade him that it was too bad that Pat had to become involved, Barkman added to the pressure by leaving for Pat's apartment. The record unmistakably indicates that Barkman intended to interrogate Pat and that Thierman was aware of his purpose. Even under our flexible *Rodriguez-Gastelum* test, it is at least arguable that all this was an impermissible attempt to "badger the suspect or bring pressure intended to induce a change of mind." *United States v. Rodriguez-Gastelum, supra,* 569 F.2d at 488. Pursuant to *Edwards* and *Innis,* it is clearly impermissible police-initiated interrogation.

If I were writing on a clean slate, however, I might well join the majority in affirming Thierman's conviction. The officers investigating this crime followed *Miranda* as best they could by ceasing all direct questioning once Thierman invoked his right to counsel. Their conduct was in all respects undertaken in perfect good faith and simply manifested their desire to uncover the truth by use of all the investigative and psychological tools at their disposal. I believe the law should commend police officers who determinedly ferret out confessions while simultaneously endeavoring to uphold the *Miranda* safeguards. If I had a choice, I would hold that waiver of the *Miranda* right to counsel is measured by all the surrounding facts and circumstances, and may in a proper case be implied from a suspect's knowing and intelligent decision to resume questioning, regardless of who initiated the conversation, after the right to counsel has been expressly invoked. Yet the courts of appeals rarely write on such a clean slate. Although I believe that this case demonstrates the overbreadth of the highly technical rules announced in *Edwards,* I cannot decipher a principled ground upon which to distinguish that case. I regret that I must dissent.