560 So.2d 207 (1990)
Duane Eugene OWEN, Appellant,
v.
STATE of Florida, Appellee.
No. 68550.
Supreme Court of Florida.
March 1, 1990.
Rehearing Denied May 2, 1990.
*209 Theodore S. Booras, Michael Salnick and Barry E. Krischer of Salnick & Krischer, West Palm Beach, for appellant.
Duane Eugene Owen, Starke, in pro. per.
Robert A. Butterworth, Atty. Gen., and Georgina Jimenez-Orosa, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Appellant Owen was convicted of burglary, sexual battery, and first-degree murder. The jury recommended and the judge imposed a death sentence for the murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The victim was baby-sitting for a married couple on the evening of March 24, 1984, in Delray Beach. During the evening, she called home several times and spoke with her mother, the last call taking place at approximately 10 p.m. When the couple returned home, just after midnight, the lights and the television were off and the baby-sitter did not meet them at the door as was her practice. The police were summoned and the victim's body was found with multiple stab wounds. There was evidence that the intruder entered by cutting the screen to the bedroom window. He then sexually assaulted the victim. A bloody footprint, presumably left by the murderer, was found at the scene.
In late May 1984, Owen was apprehended in Boca Raton after he was identified as a burglary suspect. Routine booking disclosed that there were outstanding warrants against him and while being held on these charges, he initiated contact with the police and was interrogated relative to various crimes committed on June 3, 6, 7, and 8. He was also questioned relative to a May 29, 1984, burglary, sexual battery, and murder in Boca Raton. During these interrogations, Owen expressed contempt for lawyers and a desire to help clean up crimes with which he had been charged or suspected. He specifically stated that he did not want a lawyer present but he asked that a certain officer (Woods) from Delray Beach who knew him from previous encounters be present for the interrogation. After confessing to numerous burglaries, sexual batteries, and other lesser crimes, he refused to talk further to the police about the Boca Raton murder and terminated the interrogation. On June 18, he reinitiated contact with the police and renewed his spate of confessions. He also corrected and amplified earlier confessions. *210 On June 21, the Delray Beach police obtained an inked impression of Owen's footprints and the Boca Raton police informed him that, based on fingerprints taken from the crime scene and other evidence, they were charging him with first-degree murder. After the Boca Raton police presented their evidence to Owen, he confessed to the May 29 burglary, sexual battery, and murder. His account of this crime was remarkably similar to his earlier confessions to three crimes where he removed his clothes, committed a burglary, and either choked or bludgeoned sleeping victims into unconsciousness before committing sexual battery.
Immediately after the above confession to the May 29 Boca Raton murder, the Delray Beach police interrogated Owen relative to the March 24 Delray Beach crime. He first denied any knowledge of this crime, but confessed after the police confronted him with the bloody footprint from the crime scene and the inked impression of his foot taken earlier that day. The details were again remarkably similar to those of the earlier confessions.
At trial, the state did not attempt to introduce similar fact evidence, but relied instead on Owen's confession and corroborating evidence. An expert on podiatry testified that the bloody footprint was consistent with Owen's, but did not identify him to the exclusion of others.
The primary issue raised by Owen concerns the admissibility of his confession. He contends that (1) the confession was compelled by improper psychological coercion in violation of his fifth amendment right to remain silent, and (2) the police violated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by continuing to question him after he invoked the right to terminate questioning. He claims that the police had no well-founded suspicion upon which to stop and seize him on the street and that all subsequent confessions were thereby tainted. This argument is without merit. Owen was the subject of outstanding warrants and had been identified in a photographic lineup as a burglar. The officer who stopped him had been given a photograph and specifically alerted to watch for him in his known habitat. The police had more than founded suspicion, they had probable cause.
Owen's more serious argument is that he was psychologically coerced into confessing by extended interrogation sessions, feigned empathy, flattery, and lengthy discourse by the police. These interrogation sessions were videotaped and we have, as did the trial judge, the benefit of actually viewing and hearing them. It is clear from these tapes that the sessions were initiated by Owen, who was repeatedly advised of his rights to counsel and to remain silent. Moreover, he acknowledged on the tapes that he was completely familiar with his Miranda rights and knew them as well as the police officers. It is also clear that the sessions, which encompassed six days, were not individually lengthy and that Owen was given refreshments, food, and breaks during the sessions. The tapes show that the confession was entirely voluntary under the fifth amendment and that no improper coercion was employed. Martin v. Wainwright, 770 F.2d 918, 924-28 (11th Cir.1985), modified, 781 F.2d 185 (11th Cir.), cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).
Owen next argues that even if the confession was voluntary under the fifth amendment, it was nevertheless obtained in violation of the procedural rules of Miranda. On this point, we agree. Throughout the interrogation sessions, Owen had indicated his desire to confess to crimes for which he felt the police had sufficient evidence to convict. Consequently, there evolved a procedure whereby the police officers would present their evidence and attempt to persuade him that they had the necessary proof. On June 21, after the Boca Raton police presented the fingerprint evidence and the similarity of the crime to earlier burglary rapes to which Owen had confessed, he acknowledged his guilt and responded to further questions. Thereafter, the Delray Beach police took up questioning on the instant crime. After police presented evidence on the "matched" footprints, alluded to evidence they expected *211 to develop and the close similarity of the crime to the Boca Raton murder and earlier burglaries and rapes, Owen closely studied the footprint impression and appeared to acknowledge the conclusiveness. However, when police inquired about a relatively insignificant detail, he responded with "I'd rather not talk about it." Instead of exploring whether this was an invocation of the right to remain silent or merely a desire not to talk about the particular detail, the police urged him to clear matters up. He was soon responding with inculpatory answers and asking questions of his own. After further exchanges and a question on another relatively insignificant detail, Owen responded with "I don't want to talk about it." Again, instead of exploring the meaning of the response, the police pressed him to talk.
When presented with the motion to suppress, the trial judge initially indicated that the continuation of the questioning after the responses appeared to be a clear violation of Miranda, rendering the statements thereafter inadmissible. However, after reviewing the complete interrogation sessions, the judge concluded that the responses were not an invocation of the right to remain silent. The ruling of the trial court on a motion to suppress comes to us clothed with a presumption of correctness and we must interpret the evidence and reasonable inference and deductions in a manner most favorable to sustaining the trial court's ruling. McNamara v. State, 357 So.2d 410, 412 (Fla. 1978). The state urges that on the totality of the circumstances, we should affirm the ruling below. Counterposed to this argument is the well-established rule that a suspect's equivocal assertion of a Miranda right terminates any further questioning except that which is designed to clarify the suspect's wishes. See Long v. State, 517 So.2d 664 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), and cases cited therein; and Martin, where although there was no violation of the fifth amendment by continuing questioning after an equivocal invocation of Miranda rights, the court held that the continued questioning was reversible error under Miranda. Given this clear rule of law, and even after affording the lower court ruling a presumption of correctness, we cannot uphold the ruling. The responses were, at the least, an equivocal invocation of the Miranda right to terminate questioning, which could only be clarified. It was error for the police to urge appellant to continue his statement. Such error is not, however, per se reversible but before it can be found to be harmless, the Court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman v. State, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); Martin v. Wainwright. Applying this standard, we are unable to say in this instance that the error was harmless beyond a reasonable doubt. Even though there was corroborating evidence, Owen's statements were the essence of the case against him. We accordingly reverse Owen's convictions on the basis of the inadmissible statements given after the response, "I'd rather not talk about it."[1]
We address additional issues which may recur should a retrial occur. In accordance with section 921.143, Florida Statutes (1983), the trial judge heard testimony from the victim's family on the impact of the crime after receiving the jury's advisory recommendation of death. The judge did not have the benefit of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, (1987), and of Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989), but nevertheless recognized that victim impact evidence by family members could not be used as an aggravating factor. If a death penalty phase is reached in a retrial, such evidence should not be received.
During the guilt phase, the victim's mother was permitted to testify, over objection, concerning certain corroborating evidence. Owen claims that the evidence was not at issue and that permitting the victim's mother to take the stand was unduly *212 prejudicial. At trial, the basis of the objection was that the mother had been unable to control her emotions during an earlier deposition and her testimony was being presented for the sole purpose of creating improper sympathy. The record does not show that the mother was unduly emotional during her testimony, which corroborated Owen's confession. The mother's testimony meets the relevancy test; we see no error.
Appellant also claims that the jury should have received a special instruction during the penalty phase stressing the extreme importance of the jury's advisory recommendation. In appellant's view, Florida's standard jury instruction denigrates the role of the jury contrary to Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We have previously held, contrary to appellant's position, that the standard jury instructions accurately reflect Florida law. Combs v. State, 525 So.2d 853 (Fla. 1988).
Owen also argues that the trial court erred in not directing a verdict on the sexual battery charge because the evidence shows that the victim was dead before sexual union and Florida law does not criminalize necrophilia. In support, he cites the testimony of the medical examiner that the victim had "probably" died from her massive wounds before being transported to the bedroom, where appellant confessed that he "raped her, I guess you could say."
In defining sexual battery, section 794.011, Florida Statutes (1983), refers to the victim as "another" and as "the person." We are satisfied that under the legislative definition a victim must be alive at the time the offense commences. Sexual union with a previously deceased person, as in a morgue, would not meet the definition of sexual battery. However, we do not believe that the legislature intended that a person who is alive at the commencement of an attack must be alive at the end of the attack. Here we need not decide this precise issue because the jury was instructed regarding the distinction between sexual battery on a live person and attempted sexual battery on a victim killed in the course of the crime before sexual union is achieved. The verdict of guilt on the sexual battery count resolves this question of fact. In denying the motion for a directed verdict, the trial court relied on the well-established rule that a defendant's motion for acquittal admits "every conclusion favorable to the [state] that a jury might fairly and reasonably infer from the evidence" and the motion should not be granted "unless the evidence is such that no view which the jury may lawfully take ... can be sustained under the law." Lynch v. State, 293 So.2d 44, 45 (Fla. 1974).
Owen has filed two pro se briefs, in addition to the briefs filed by his counsel. Most of the issues raised duplicate those raised by appointed counsel, but one issue merits comment. Owen claims that his trial counsel, who is also serving as his appellate counsel, was ineffective. Although this issue is customarily handled in a 3.850 hearing, it may be raised on direct appeal under rare circumstances where it is preserved and the ineffectiveness is apparent on the face of the record. Refusal to address the issue under such circumstances would be a waste of judicial resources. No such circumstances exist here. Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla. 1987). Here, there is nothing on the face of the record even remotely suggesting ineffective assistance of trial counsel and appellant repeatedly expressed satisfaction with trial counsel's performance in response to queries from the trial judge. What concerns us is not only that appellant makes such an assertion concerning his current appointed counsel, but also his apparent belief that he is entitled to independently defend his case by submitting pro se briefs without reference to the actions of his appointed counsel. On remand, assuming retrial, the trial judge is directed to clarify this situation and make the appellant aware of Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and his choices thereunder. We reverse all convictions and remand for retrial.
It is so ordered.
*213 OVERTON, McDONALD, SHAW and KOGAN, JJ., concur.
BARKETT, J., concurs specially with an opinion, in which KOGAN, J., concurs.
GRIMES, J., dissents with an opinion, in which EHRLICH, C.J., concurs.
BARKETT, Judge, specially concurring.
I concur in the decision to reverse because the interrogation subsequent to appellant's assertion of his right to remain silent was improper. As the Miranda Court stressed: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74, 86 S.Ct. at 1627-28 (emphasis added). And, as the Court later explained in Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), the admissibility of statements obtained after a person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was "scrupulously honored." In this case, it was not.
KOGAN, J., concurs.
GRIMES, Judge, dissenting.
I must respectfully dissent from the holding in this case and that portion of the majority opinion concerning the Miranda[1] issue. I do not believe that current case law requires police to cease questioning a suspect simply because, as happened here, the individual expresses some reluctance to confront the details of his crime. Nor do I believe in the context of the extended series of interviews between Owen and police that his two statements  "I'd rather not talk about it," and "I don't want to talk about it"  must be construed as a request for a lawyer or a request to cut off questioning.
Initially, several points need to be emphasized. As the majority touched on in its discussion of the first issue, the police questioning of Owen was totally lawful. Often he initiated contact. None of the interviews was especially long; Owen never complained about the questioning and never directly halted a session. The interviews were brought to a close by the officers, apparently when they felt Owen had told them all he would tell them in that session. The officers' conduct was in no way coercive, though they did attempt to persuade Owen to confess. Owen was not browbeaten or threatened with anything other than the probability that criminal charges would be brought against him. Prior to all sessions, he waived his Miranda rights, including the right to consult a lawyer and to have one present.
The two statements Owen made must be seen in the context not only of the conversation during which they occurred but also of the relationship that had built up between Owen and the two policemen who did most of the questioning, Lieutenant Kevin McCoy, Boca Raton Police Department, and Officer Mark Woods, Delray Beach Police Department. This series of interviews was a long cat-and-mouse game between Owen and the detectives; indeed, the game may have begun with the killings.[2] Often he would appear ready to talk about the murders, only to change the subject.
The portrait of Owen that emerges from these interviews is of a person who wanted to impress the officers with his intelligence, with his cunning, and with his skill as a criminal. He even alleged that he had taken criminology and crime scene analysis courses at a college while in Michigan. He never exhibited any reticence in admitting *214 criminal acts generally,[3] and never indicated any desire to speak with an attorney. It is clear from reading the record that Owen did not mean he had changed his mind about talking to police and that he wished to speak with a lawyer before continuing. His comments are those of someone who does not want to face the truth, not someone who seeks legal counsel.
Long v. State, 517 So.2d 664 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), which the majority cites for authority, involved a statement: "I think I might need an attorney." The United States Supreme Court has required an immediate cessation of interrogation upon any request by the defendant for an attorney. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, with respect to a suspect's terminating an interrogation where no request for counsel is involved, that Court has said that "[t]hrough the exercise of his option to cut off questioning, he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Michigan v. Mosely, 423 U.S. 96, 103-04, 96 S.Ct. 321, 326-27, 46 L.Ed.2d 313 (1975).
In United States v. Thierman, 678 F.2d 1331 (9th Cir.1982), the court considered the validity of a confession made to the police after the defendant had earlier asked, "Can we talk about it tomorrow?" The court said:
Twice Thierman was advised of his Miranda rights and each time he agreed to answer some questions and refused to answer questions on certain topics. A person in custody may selectively waive his right to remain silent by indicating he will respond to some questions, but not to others. United States v. Lopez-Diaz, 630 F.2d 661, 664 n. 2 (9th Cir.1980); United States v. Lorenzo, 570 F.2d 294, 297-98 (9th Cir.1978)... .
The only other event relevant to whether Thierman invoked his right to remain silent occurred when he inquired "Can we talk about it tomorrow?" The district judge was not required to interpret Thierman's question as an invocation of his right to remain silent. The question is more easily construed as a mere request to postpone interrogation on a single subject than an outright refusal to answer any more questions.
Id. at 1335-36. The Eleventh Circuit Court of Appeals in Martin v. Wainwright, 770 F.2d 918 (11th Cir.1985), modified, 781 F.2d 185, cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986), disagreed with Thierman to the extent that it held that the defendant's statement, "Can we wait until tomorrow?" constituted an invocation of the right to cut off questioning. However, that court did not dispute the Thierman court's premise that the defendant's election to remain silent on a single subject does not necessarily require that the interrogation be completely terminated. In fact, the court in Martin distinguished Thierman by pointing out that in that case the surrounding circumstances "indicated that the suspect's request concerned a particular subject matter and not the interrogation in general." Martin, 770 F.2d 924 n. 6.
It seems to me that the instant case is closer to Thierman. When Owen made his first statement that the majority finds objectionable, Lieutenant Rick Lincoln, a newcomer to the interview, was talking to him about the similarities between the Boca Raton murder and the one in Delray Beach, while showing him the footprint he had left behind in Delray Beach.
OFFICER LINCOLN: ... .
Duane, this is you. This stuff proves it's you.
THE DEFENDANT [OWEN]: Yeah, it looks identical to me.
OFFICER LINCOLN: Sure, it is.
Tell me about it for you, Duane.
I think you need to.
I know you want to.
... .
Yeah, you're right, this is you.

*215 When did you first see her?
Now is the time, Duane.
We can't have stuff on this thing.
OFFICER WOODS: It's good enough.
I know what you're thinking.
THE DEFENDANT [OWEN]: That's it, man.
OFFICER WOODS: You're taking a look at it and you're checking it out.
THE DEFENDANT [OWEN]: Yeah.
OFFICER WOODS: And that's it. That's the bottom line.
OFFICER LINCOLN: Satisfy yourself right now.
There's a few things 
OFFICER WOODS: Yeah.
OFFICER LINCOLN:  that I have to know, Duane.
A couple pieces of the puzzle don't fit.
How did it come down?
Were you looking at that particular house or just going through the neighborhood?
THE DEFENDANT [OWEN]: I'd rather not talk about it.
OFFICER WOODS: Why?
OFFICER LINCOLN: Why?
You don't have to tell me about the details if you don't want to if you don't feel comfortable about that.
Was it just a random thing?
Or did you have this house picked out.
That's what I'm most curious about.
Things happen, Duane.
We can't change them once they're done.
THE DEFENDANT [OWEN]: No.
OFFICER LINCOLN: But you can sure make it easier on two parents that need to know.
OFFICER WOODS: And a whole town full of babysitters that are afraid to go outside.
That's how the kids make all their money in the summer.
OFFICER LINCOLN: Had you ever been to that house before?
THE DEFENDANT [OWEN]: That was a big scene over there.
At this point the conversation shifted, with the officers trying to find out if Owen had known the victim or the family for whom she had been babysitting and how long it had taken him to get into the house. They interspersed these questions with statements flattering Owen and with demonstrations of how evidence was sufficient to convict him.
Finally, Owen said he had not been to the murder scene and the subject shifted to where his bicycle had been left.
THE DEFENDANT [OWEN]: How do you know I even had a bike?
You don't even know that.
OFFICER LINCOLN: You tell me you didn't have a bicycle.
See, you won't lie, Duane.
I know you won't lie when you are confronted with the truth.
Now, are you going to tell me you didn't have a bicycle?
I know that much about you now.
You play by the rules. Those rules are important.
We all need rules.
Now did you have a bicycle?
Of course, you did.
Now, where did you put it?
THE DEFENDANT [OWEN]: I don't want to talk about it.
OFFICER LINCOLN: Don't you think it's necessary to talk about it, Duane?
Two months have gone by already, Duane.
That's a long time. It's a long time for people to work. It's a long time for you to hold it within yourself. It's a long time for people to wonder.
... .
OFFICER LINCOLN: I won't make you tell me something you're not comfortable in talking about, Duane.
But I do want to know some of the things that shouldn't hurt that much to talk about.
What you did with the bicycle? How long you were outside the house? Those kinds of things.
I know what you're reluctant to talk about and I won't press you on that.

*216 THE DEFENDANT [OWEN]: I don't see what them kind of things got to do with it anyway.
OFFICER LINCOLN: It's all part of the crime, Duane.
And I know you're uncomfortable about talking about certain aspects of it, and I respect that.
Do you know what time it was when you first got to the house?
Do you remember?
OFFICER WOODS: What time was it, Duane?
THE DEFENDANT [OWEN]: Let me take  use the bathroom, first.
OFFICER WOODS: Sure. I have to also.
It is not perfectly clear what Owen meant by his comments, but it is clear from a totality of the circumstances that he did not want to quit talking to the officers about the crime. While the police in this case did not immediately cease questioning Owen on the two topics he indicated a reluctance to discuss  whether the house had been predetermined and where the bicycle had been left  their follow-up questions can fairly be seen as attempts to determine what Owen did mean. In any event, Owen did not make meaningful responses to these inquiries and the discussion shifted to other aspects.
Owen's attitude toward the questioning can be seen graphically in the circumstances surrounding the actual confession. When the questioning reconvened from the break, Officer Woods left to get coffee, leaving Owen and Lieutenant Lincoln alone. Owen mentioned the possibility of visiting with his brother, commented on the fact that he would get bad publicity for facing two counts of first-degree murder, and asked about the possibility of unrelated minor charges being filed against him.
OFFICER LINCOLN: I have no idea. See, I'm talking about a homicide here. I don't know about all that other stuff. That's what we're dealing about tonight.
THE DEFENDANT [OWEN]: How come you don't carry around this big briefcase full of bullshit like he [Woods] does?
OFFICER LINCOLN: I don't think I need to, do you?
THE DEFENDANT [OWEN]: No.
OFFICER LINCOLN: I think we're talking about something. We're talking about an event that took place. I know about it because I was there. You know about it because you were there. So why do I need a big sheaf of papers? We're both intelligent people with memories, am I right? How long were you outside the house, Duane? Hours? Minutes?
THE DEFENDANT [OWEN]: You guys got me good, man.
OFFICER LINCOLN: Yeah.
THE DEFENDANT [OWEN]: Yeah. I knew it, too.
OFFICER LINCOLN: Did you?
THE DEFENDANT [OWEN]: Yep. As soon as they asked me for footprints.
These excerpts show two things: First, that the conversations were two-way transactions, with both the officers and Owen trying to gather information. Owen was trying to learn how good a case the police had. Second, and more importantly, they show that Owen did not wish for questioning to cease; indeed, he wished for it to continue until he had made up his mind to end the game. It should be noted that his confession was not triggered by a particularly insightful or accusatory question. It is also important that this confession was hardly different from any other that Owen gave as to lesser crimes. There was no emotional breakdown, simply a statement of fact.
Under these circumstances, I would uphold the trial judge's denial of the motion to suppress which comes to us with a presumption of correctness. I believe that Owen's comments can fairly be understood as intending only to cut off questioning on a particular subject and not a request to terminate questioning in its entirety.
EHRLICH, C.J., concurs.
NOTES
[1] Statements made before this response do not implicate Miranda rights.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] For example, the Delray Beach victim was stabbed to death and a hammer was found beside her, while the Boca Raton victim was killed by multiple blows with a hammer, a knife being found nearby. While in jail Owen wrote rhymes that seemed intended to tantalize the officers. One went: "Roses are red, white, yellow and pink. To play my game you've got to think." Also, one detective asked Owen to fill in a blank with the number of murder victims. Owen deflected the question but, he said later, drew a square on his styrofoam coffee cup and filled in the number two while he talked. The officer had not noticed the cup.
[3] In fact he admitted, and showed no remorse for, numerous instances of drug abuse, several unreported break-ins, and one incident of "flashing" a young woman on the campus of Florida Atlantic University.