[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13592

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 11, 2012
JOHN LEY
CLERK

D.C. Docket No. 9:08-cv-80876-PAS

DUANE EUGENE OWEN,

Petitioner-Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 11, 2012)

Before DUBINA, Chief Judge, and HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

Florida death row inmate Duane Eugene Owen appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After review and oral argument, we affirm.

## I. BACKGROUND

Owen is under two death sentences for two murders in 1984, for which he was separately tried, convicted, and sentenced. Owen's March 24, 1984 murder of Karen Slattery in Delray Beach, Florida, is the subject of this appeal. Owen's May 28, 1984 murder of Georgianna Worden in Boca Raton, Florida, is the subject of this Court's decision in Owen v. Secretary for the Department of Corrections, 568 F.3d 894 (11th Cir. 2009).

The Slattery and Worden cases are legally distinct but factually similar. In each murder, Owen broke into a private home late at night, removed most of his clothing, sexually assaulted the victim, and brutally murdered the victim (he killed Slattery with a knife, Worden with a hammer). Delray Beach and Boca Raton police worked together to investigate the murders and, after Owen's arrest, questioned Owen about both murders. Owen confessed to both murders on the same day.

We discuss the Worden murder, investigation, and legal proceedings where necessary for context. Otherwise, we confine our discussion to the Slattery

2

murder case on appeal here.

## A. Slattery Murder Investigation

On the evening of March 24, 1984, victim Karen Slattery, who was 14 years old, was babysitting for William and Carolyn Helm at their home in Delray Beach. Just after midnight, the Helms returned home and found a large pool of blood in the kitchen, with drag marks leading toward the master bedroom. The Helms called the police, who found Slattery's body in the master bedroom. Slattery's body had 18 knife wounds and showed evidence of sexual assault.[1] There were eight stab wounds on Slattery's back, six stab wounds on her neck, and four cutting wounds on the front of her throat. The Helm children, ages three and seven, were in their own bedroom, asleep and unharmed. Police discovered that Slattery's killer entered the Helms' home by cutting the screen to a window in the master bedroom. Police found a bloody footprint made by the killer's bare or stockinged right foot.

On May 29, 1984, Boca Raton police arrested Owen on unrelated burglary charges and outstanding warrants for failure to appear. See Owen v. State, 560 So.

---

[1]A vaginal swab tested positive for semen. Based on the state of serology analysis available at the time, police "found nothing in the semen evidence to indicate or to eliminate Duane Owen as a contributor to the semen." However, in the late 1990s, new DNA testing of the semen showed that the semen found in Slattery's body contained DNA markers linking it to Owen, who is Caucasian, and only 1 out of 690 million Caucasian males would have those same DNA markers.

2d 207, 209 (Fla. 1990) ("Owen I"), abrogated in part by State v. Owen, 696 So. 2d 715 (Fla. 1997) ("Owen III"). On that same day, Worden's body was found in Boca Raton.

Over the next three weeks, police questioned Owen about various crimes they believed Owen committed. The police questioning, which was videotaped, occurred over six days: June 3, 6, 7, 8, 18, and 21, 1984. As the Florida Supreme Court explained, Owen initiated many of the questioning sessions, was repeatedly advised of his rights to remain silent and to counsel, acknowledged and waived those rights, and expressed a desire to confess to crimes if the police could convince him they had enough evidence to convict him. Owen I, 560 So. 2d at 209–10. "Consequently, there evolved a procedure whereby the police officers would present their evidence and attempt to persuade him that they had the necessary proof." Id. at 210.

On the first four days of questioning, Owen confessed to a number of burglaries, sexual batteries, and other crimes. On the fifth day, June 18, Owen reinitated contact with police and renewed and expanded upon his earlier confessions.

B.    **Owen's June 21 Confession**

On the sixth day, June 21, 1984, police obtained from Owen, through a

4

court order, an inked footprint standard to compare to the footprint found at the Slattery crime scene. Later that day, police officers interviewed Owen, and Owen confessed to the Worden and Slattery murders.

The June 21, 1984 questioning began at 6:29 p.m.[2] Boca Raton police officer Kevin McCoy read Owen his <u>Miranda</u> rights, and Owen said he understood them. Officer McCoy and another officer revealed that Owen had left a fingerprint at the Worden murder scene. Owen conceded that the fingerprint was "[r]eally strong evidence." Owen then confessed to murdering Worden, and answered questions about details of his crime.

Later, at 7:39 p.m., police initiated a new interview with Owen, this time about the Slattery murder. Most of the questioning was by Delray Beach police officer Mark Woods and his supervisor, Lt. Rick Lincoln. Owen was read his <u>Miranda</u> rights again, and Owen again indicated he understood them.

The entire Slattery interview, including breaks, lasted about three hours. Officer Woods discussed the Slattery evidence with Owen. Owen suggested the evidence was not as strong as the Worden evidence, stating, "they found a fingerprint in that other one." Owen was asked whether the fingerprint was "what

---

[2]We have a precise chronology of the interview on June 21, 1984 because it, like the other Owen police interviews, was video-recorded.

it took to get you to tell them about" the Worden murder, and Owen responded, "Once I see it on paper, you know. . . . [T]hey found the fingerprint . . . and . . . so, like they say, the game is over, man."

Lt. Lincoln told Owen it was "really not difficult to put [the Slattery and Worden] cases together" because "the similarities are just astounding." Early in the interview, Lt. Lincoln showed Owen pictures of the bloody footprint left at the Slattery crime scene and Owen's inked footprint impression. Officer Woods told Owen it was "the same footprint," and Owen agreed that it "looks identical to me."

Throughout the three-hour Slattery interview, Owen freely answered many questions. Even early on in the interview, Owen never disavowed his guilt in Slattery's murder—as Lt. Lincoln later pointed out, Owen "won't lie" when "confronted with the truth"—and Owen even inculpated himself by admitting his footprint "looks identical" to the one made in Slattery's blood. The Miranda-confession issues here involve only two time points in the interview, and we quote the relevant interrogation for full context.

After 43 minutes of the Slattery interview, the officers inquired about whether Owen had looked for a particular house. Owen replied: "I'd rather not talk about it," as follows:

OFFICER LINCOLN: Satisfy yourself right now. There's a few things

6

. . . that I have to know, Duane.  <u>A couple pieces of the puzzle don't fit.
How did it come down?  Were you looking at that particular house or
just going through the neighborhood?</u>
THE DEFENDANT: <u>I'd rather not talk about it.</u>
OFFICER WOODS: Why?
OFFICER LINCOLN: Why?  <u>You don't have to tell me about the details
if you don't want to if you don't feel comfortable about that.</u>  Was it just
a random thing?  Or did you have this house picked out?  That's what
I'm most curious about[.] Things happen, Duane.  We can't change them
once they're done.
THE DEFENDANT: No.

(Emphasis added.)

The officers asked Owen about other details of the Slattery murder and reminded him of the evidence against him.  Lt. Lincoln said "the time has come," and Owen responded, "Yeah."  Owen admitted, "There ain't no way out," but he was "just trying to think about the situation, you know."

In response to further questioning, Owen told the officers that he did not know the Helms and had never been to their house before the night Slattery was killed.  Then, at seventy minutes into the Slattery interview, the police officers asked a series of questions about the bicycle Owen rode to the Helms' house, and Owen answered questions.  At one point, however, in response to a specific question about where Owen put the bicycle, Owen said, "I don't want to talk about it," as follows:

OFFICER LINCOLN: . . . What did you do with it?  You must have put

it someplace[.] Where?  Over in that field across from the house?  A lot of woods over in there.  That's where I'd probably put it.  Is that where you put it?

OFFICER WOODS: He don't have the bicycle, Duane.  He's just trying to fill in the blanks, you know.

THE DEFENDANT: Yeah.

OFFICER LINCOLN: Duane knows.

OFFICER WOODS: Tell him.

OFFICER LINCOLN: There's only two places it could have—could have been, Duane, after you moved it.  Either behind the house or in front of the house.  Which was it?

OFFICER WOODS: Well?

THE DEFENDANT: How do you know I even had a bike?  You don't even know that.

OFFICER LINCOLN: You tell me you didn't have a bicycle.  See, you won't lie, Duane.  I know you won't lie when you are confronted with the truth.  Now, are you going to tell me you didn't have a bicycle?  I know that much about you now.  You play by the rules.  Those rules are important.  We all need rules.

Now, did you have a bicycle?  Of course, you did.  Now, where did you put it?

THE DEFENDANT: I don't want to talk about it.

(Emphasis added.)[3]

Later in the interview, Owen asked the officers if they could arrange for Owen's brother to speak to him in person.  Lt. Lincoln said he was not in a position to make any promises.  Lt. Lincoln told Owen that "Boca's got you nailed" for the Worden murder, and Owen could not "be punished twice for the same thing."  Owen replied, "I know, but two counts, man, that's pretty heavy, you

---

[3]The two questions to which Owen responded by saying he did not want to talk about it occurred 27 minutes apart.

8

know." The conversation continued, and Owen admitted the police had "got [him] good":

> Q. How long were you outside the house, Duane? Hours? Minutes?
> A. You guys got me good, man.
> Q. Yeah.
> A. Yeah. I knew it too.
> Q. Did you?
> A. Yep. As soon as they asked me for footprints. . . . I knew they wouldn't be asking for it unless they had something.
> Q. Yeah.
> A. Yeah, unless they had something, man.
> Q. How long were you outside?
> A. What the hell, like you said, two— It doesn't make no difference once you got one.

After pausing to think for a moment "about specifics and stuff," Owen began to share the details of the Slattery crime. The details Owen provided, some of which only the killer would know, included the following: (1) he put socks on his hands before he entered through the bedroom window; (2) he stole a pair of leather ladies gloves inside the house and moved his socks back to his feet; (3) he closed the door to the children's room; (4) Slattery was watching television and, after pausing to check on the children, picked up the phone to make a call when Owen confronted her; (5) Owen grabbed the phone from Slattery and put it back on its cradle; (6) Owen then began "sticking her" with the knife; (7) Slattery tried to push Owen away and he came up from behind and stabbed her in the back; (8)

9

Slattery fell to the floor on her back and stopped fighting; (9) Owen checked on the children again and shut their door, locked the front door and turned off most of the lights; (10) Owen dragged Slattery by her feet into the bedroom; (11) Owen took off her shorts and pushed up her shirt and bra, then raped her; and (12) Owen showered before leaving.

## C.    Motion to Suppress

In the Slattery case, a grand jury indicted Owen on charges of first-degree murder, sexual battery, and burglary of a dwelling with intent to commit sexual battery inside.  Owen's counsel moved to suppress Owen's confession.  After holding an evidentiary hearing, the state trial court denied Owen's motion to suppress.

## D.    First Trial and Reversal on Direct Appeal

In 1985, Owen was tried in the Slattery case.  The State introduced Owen's confession, plus corroborating evidence, including the bloody footprint.  The jury found Owen guilty on all charges.

After the penalty phase, the jury recommended the death penalty on the first-degree murder conviction by an 11-to-1 vote.  The state trial court imposed the death penalty for the Slattery murder conviction and life imprisonment for the

10

sexual battery and armed burglary convictions.[4]

Owen appealed. The Florida Supreme Court reversed Owen's convictions and remanded for a new trial. Owen I, 560 So. 2d at 212. The Florida Supreme Court concluded that, although Owen's confession to the Slattery murder was voluntary for Fifth Amendment purposes, it was "obtained in violation of the procedural rules of Miranda" because the questioning continued after Owen made the statements, "I'd rather not talk about it," and "I don't want to talk about it." Id. at 210–11 (citing Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966)).

The Florida Supreme Court determined it could not affirm the denial of Owen's motion to suppress in light of "the well-established rule that a suspect's equivocal assertion of a Miranda right terminates any further questioning except that which is designed to clarify the suspect's wishes." Id. at 211 (emphasis added). The Florida Supreme Court found that Owen's "responses were, at the least, an equivocal invocation of the Miranda right to terminate questioning, which could only be clarified." Id.

E.     **Supreme Court's Intervening Decision in Davis v. United States**

In 1994, more than four years after the Florida Supreme Court's remand but

_____

[4]Later, in 1986, Owen was tried and convicted of Worden's murder and was sentenced to death. On direct appeal, the Florida Supreme Court affirmed Owen's Worden convictions and sentence. Owen v. State, 596 So. 2d 985 (Fla. 1992).

before Owen was re-tried, the United States Supreme Court decided Davis v. United States, 512 U.S. 452, 114 S. Ct. 2350 (1994).  In Davis, the Supreme Court held that if a suspect during police questioning makes an "ambiguous" or "equivocal" reference to an attorney, such "that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel" under Miranda, the police need not cease questioning the suspect. Davis, 512 U.S. at 459, 114 S. Ct. at 2355.  Instead, to assert his right to counsel, a "suspect must unambiguously request counsel"—that is, he "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  Id. (emphasis added).  Further, although "it will often be good police practice" for police officers confronted with an ambiguous or equivocal statement to ask clarifying questions, the Supreme Court declined to require clarifying questioning, reiterating that "[u]nless the suspect actually requests an attorney, questioning may continue."  Id. at 461–62, 114 S. Ct. at 2356–57.

## F. State's Motion to Reconsider

After Davis, the State moved the state trial court to "revisit the Florida Supreme Court's ruling" as to the suppression of Owen's confession.  The state trial court denied the motion, and the State petitioned the Fourth District Court of

12

Appeal for certiorari. The Fourth District Court of Appeal denied certiorari but certified the issue of the admissibility of Owen's confession to the Florida Supreme Court. State v. Owen, 654 So. 2d 200, 202 (Fla. 4th DCA 1995) ("Owen II").

On certification, the Florida Supreme Court in Owen III concluded, "Davis now makes it clear that, contrary to our belief at the time, federal law did not require us to rule Owen's confession inadmissible." Owen III, 696 So. 2d at 718. Although Davis involved an ambiguous request for an attorney, the Florida Supreme Court determined that Davis's reasoning applies to an equivocal or ambiguous "assertion of any right under Miranda," including the right to remain silent. Id. at 717–18. The Florida Supreme Court concluded that "police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation." Id. at 719. Florida's constitution and the U.S. Constitution were coterminous as to the application of Miranda on this issue. Id. at 719–20.

In Owen III, the Florida Supreme Court then turned to "the question of how to treat Owen's confession" in light of its prior holding in Owen I that the confession was inadmissible. Id. at 720. The Florida Supreme Court recognized the law of the case doctrine, but noted that "[a]n intervening decision by a higher

13

court"—such as the Supreme Court's <u>Davis</u> decision—is an exceptional situation in which a court could depart from the law of the case and reconsider a prior legal decision made in a case.  <u>Id.</u>  The Florida Supreme Court concluded that "reliance upon our prior decision in Owen's direct appeal would result in manifest injustice to the people of this state because it would perpetuate a rule which we have now determined to be an undue restriction of legitimate law enforcement activity."  <u>Id.</u>

The Florida Supreme Court did not reinstate Owen's convictions, however, but instead remanded for new proceedings in the trial court under the <u>Davis</u> rationale:

> Because Owen's responses were equivocal, the State would have this Court reinstate Owen's convictions on the ground that a retrial is unnecessary in light of our decision. We are unwilling to go that far. Our prior decision which reversed Owen's convictions and remanded for a new trial is a final decision that is no longer subject to rehearing. With respect to this issue, Owen stands in the same position as any other defendant who has been charged with murder but who has not yet been tried. Just as it would be in the case of any other defendant, the admissibility of Owen's confession in his new trial will be subject to the <u>Davis</u> rationale that we adopt in this opinion. However, Owen's prior convictions cannot be retroactively reinstated.

<u>Id.</u> (footnote omitted).[5]  In short, having reversed Owen's earlier convictions and

---

[5]In stating that Owen's responses were "equivocal," the Florida Supreme Court explicitly "reject[ed] Owen's argument that because we termed his comments to be 'at least equivocal' in our earlier opinion we should now construe his comments as unequivocal."  <u>Owen III</u>, 696 So. 2d at 720 n.8.

14

remanded for a new trial, the Florida Supreme Court determined that the admission of Owen's confession at that new trial would be subject to the Davis rationale. Id.

## G. Renewed Motion to Suppress

After remand to the state trial court, Owen renewed his motion to suppress his confession. The state trial court held a hearing, at which police officers Lincoln, McCoy, and Woods again testified. Owen also testified.

The police officers each testified they did not threaten Owen or make him any promises and that they repeatedly informed Owen of his right to remain silent. Owen agreed he was made no promises and was told he could cut off questioning at any time. Owen conceded that he never invoked his right to an attorney before confessing because an attorney might advise him not to speak to police and he wanted to speak to police.

After hearing the evidence, the state trial court denied Owen's motion to suppress. The state trial court first found that, based on the totality of the circumstances, Owen's confession was voluntary.

The state trial court then examined whether Owen "unequivocally" invoked his right to remain silent on June 21, 1984. The state trial court (1) interpreted the Florida Supreme Court's Owen III decision to mean that Owen's statements were

equivocal and thus under the <u>Davis</u> rationale his confession was admissible, but (2) also independently found that, based upon its own review of the videotaped questioning, the equivocal nature of Owen's supposed invocation of his right to remain silent was "clearly depicted."

## H.    Jury Selection

In Owen's retrial, jury selection ran from January 4 to January 20, 1999. The process included a written questionnaire to the venire members, plus oral voir dire by the court and counsel.[6]  Among other things, the venire members were questioned about their views on the death penalty and an insanity defense.  Upon challenge by counsel for the parties, the state trial court excused many panel members for cause.  The State and the defense used their peremptory challenges to remove other potential jurors.

At the conclusion of voir dire, the attorneys for both sides expressly accepted the twelve jurors selected.  Owen conferred with his counsel and told the state trial court that he agreed with the jurors chosen to comprise the panel.

## I.    Guilt Phase

The guilt phase of Owen's retrial began January 20, 1999.  The State played

---

[6]Owen was represented by attorneys Carey Haughwout and Donnie Murrell, and the State by Wayne Chalu and Christopher Moody.

Owen's videotaped confession to police. The State also presented corroborating evidence, including the testimony of a DNA expert that (1) the semen found in Slattery's body contained DNA markers linking it to Owen, who is Caucasian, and (2) only 1 out of 690 million Caucasian males would have those same DNA markers.

The defense conceded that Owen committed the murder but argued he was insane at the time of the crime.[7] The defense called two mental health experts, clinical psychologist Dr. Faye Sultan and psychologist/psychiatrist Dr. Fredrick Berlin, both of whom testified Owen was insane when he murdered Slattery.[8]

During the State's cross-examination of Dr. Berlin (which took up nearly 50 transcript pages), the State briefly asked Dr. Berlin about his personal views on the death penalty. Dr. Berlin acknowledged he was opposed to the death penalty but would not let that alter his objectivity about the case:

> Q. You understand that the death penalty is a possible punishment in this case should the defendant be found guilty of first degree murder?
> A. Yes, sir.
> Q. And may I ask you, Doctor, what your view is on that issue of the

---

[7]As defense counsel Haughwout stated in her opening statement, "This case is about why it happened. We know what happened. Duane told [the police] what happened. Duane told them everything the prosecutor just told you."

[8]Dr. Berlin was unavailable to testify during the trial, so (1) he testified in court before the jury panel was selected, (2) his testimony was videotaped, and (3) selected portions of the videotape were played for the jury.

death penalty?

A. I am personally opposed to the death penalty.

Q. So you don't want to see Mr. Owen executed; isn't that correct?

A. That's correct. But I certainly wouldn't let that, to the best [of] my ability, alter my objectivity in this case. So I want to make that clear.

Owen's counsel objected to the admission of this cross-examination, arguing that Dr. Berlin's personal objection to the death penalty was (1) irrelevant to the question of Owen's guilt and sanity and (2) prejudicial because it was not shared by the jurors, who had been death-qualified. The state trial court overruled the objection.

On January 29, 1999, the jury found Owen guilty of first-degree murder, attempted armed sexual battery with a deadly weapon or force likely to cause serious personal injury, and armed burglary of a dwelling.

## J. Penalty Phase and Sentencing

At the penalty phase, Owen recalled Dr. Sultan and Dr. Berlin and called neuropsychologist Dr. Barry Crown. On March 4, 1999, the jury recommended a death sentence by a 10-to-2 vote.

On March 23, 1999, the state trial court announced Owen's sentence. On that day, nearly 15 years to the day after Owen murdered Karen Slattery, Owen,

18

for the second time, received the death penalty for her murder.[9]

## K.    Second Direct Appeal

Owen appealed to the Florida Supreme Court.  See Owen v. State, 862 So. 2d 687 (Fla. 2003) ("Owen IV").  Owen argued, among other things, that the state trial court "erred in failing to suppress Owen's confession because Owen made an unequivocal invocation of his right to remain silent which was ignored by the law enforcement officers questioning him."  Id. at 693.  Owen did not appeal the admission of the State's cross-examination of Dr. Berlin in the guilt phase about his personal view on the death penalty.

The Florida Supreme Court affirmed Owen's convictions and death sentence.  Id.  On the Miranda claim, the Florida Supreme Court found that the "trial court properly rejected Owen's motion to suppress" because the Florida Supreme Court itself had, "on numerous occasions, deemed Owen's responses to be equivocal."[10]  Id. at 697.  In any event, the Florida Supreme Court also concluded that the state trial court's independent finding of equivocality was

---

[9]Owen received a life sentence for the armed burglary and a 15-year sentence for the attempted armed sexual battery.

[10]The Florida Supreme Court pointed out that (1) in Owen III, it had "specifically stated that 'Owen's responses were equivocal'" and "rejected Owen's argument that . . . they should be considered unequivocal"; and (2) "in numerous other opinions," it had "made reference to Owen's responses as exemplars of 'equivocal utterances.'"  Owen IV, 862 So. 2d at 697.

19

"fully supported by competent, substantial evidence" at the suppression hearing.

Id. The Florida Supreme Court stated:

> Clearly, we have concluded that Owen's statements were equivocal responses in context and under the circumstances presented. Owen did not, during the motion to suppress hearing below, offer any testimony or evidence to contradict our prior determinations. Therefore, under State v. Owen, 696 So.2d 715 (Fla.1997), the law enforcement officers questioning Owen had no duty to further clarify his equivocal responses in the context presented or terminate the interrogation. The trial court properly denied Owen's motion to suppress.

Id. at 697–98.[11]

## L.    State Postconviction Proceedings

On October 31, 2005, Owen filed a Florida Rule of Criminal Procedure 3.851 motion for capital postconviction relief. Owen alleged, among other things, that he received ineffective assistance of trial counsel during jury selection because his counsel (1) failed to challenge for cause or use a peremptory challenge to remove jurors Sharon Knowles, Betty Matousek, and Betty Jean Griffin; and (2) failed to object to allegedly improper statements by the State and the trial court.

The state postconviction court held an evidentiary hearing. Owen's trial

---

[11]Owen also argued that he was coerced into confessing to the Slattery murder and thus his confession should have been suppressed because it was involuntary. Id. at 693–94. The Florida Supreme Court rejected this claim, noting that: (1) in Owen I, it had held Owen's confession was voluntary; (2) the law of the case doctrine controlled; (3) Owen did not present any new evidence justifying reviewing the voluntariness issue; and (4) even without the law of the case doctrine, the record showed that the state trial court correctly found Owen's confession was voluntary. Id. at 694–96.

counsel, Carey Haughwout, testified that she did not recall any details of what happened, or what decisions she made, during jury selection.

On September 21, 2006, the state postconviction court denied Owen's 3.851 motion. As to Owen's jury-selection claim, the state postconviction court found no deficient performance by Owen's trial counsel. The state postconviction court further concluded, as to jurors Matousek and Griffin, that Owen had not shown prejudice.

Owen appealed the denial of his 3.851 motion. He also filed in the Florida Supreme Court a state habeas petition that claimed, among other things, that his state appellate counsel was ineffective for failing to raise on appeal the State's guilt-phase impeachment of Dr. Berlin based on his personal views on the death penalty.

The Florida Supreme Court affirmed the denial of 3.851 postconviction relief and denied Owen's habeas petition. Owen v. State, 986 So. 2d 534, 541 (Fla. 2008) ("Owen V"). As to the jury-selection claim, the Florida Supreme Court noted that "'where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased' to be entitled to relief." Id. at 549 (quoting Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007)). The Florida

Supreme Court concluded that Owen was "not entitled to relief because he did not demonstrate that an actually biased juror served on his jury." Id. at 550.[12]

The Florida Supreme Court also denied Owen's claim of ineffective assistance of appellate counsel. Id. at 557. The Florida Supreme Court determined that the issue about the State's cross-examination of Dr. Berlin about his death penalty views "would have been found to be without merit on direct appeal" because, even if the trial court had erred in permitting the State to ask the questions, the error was harmless. Id.

## M. Federal Habeas Petition

On August 7, 2008, Owen filed his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Owen raised numerous claims, including violation of his right to remain silent and ineffective assistance of trial and appellate counsel. On November 30, 2010, the district court issued a thorough 67-page order denying each claim.

The district court granted a certificate of appealability ("COA") on three

---

[12]The Florida Supreme Court also rejected Owen's arguments that trial counsel was ineffective for not objecting to certain comments as to the insanity defense and mitigating circumstances by the State and the state trial court during jury selection. Owen V, 986 So. 2d at 550–551. The Florida Supreme Court concluded that Owen failed to show either deficient performance or prejudice as to the state trial court's comments on mitigating circumstances because the jury was properly instructed on mitigation and the trial court's comments on mitigation were not improper. Id. at 551. The Florida Supreme Court found that Owen failed to show any prejudice resulting from the comments by the State. Id.

claims: (1) whether the police's continued questioning violated Owen's right to remain silent and to be free from self-incrimination; (2) whether Owen's trial counsel was ineffective during jury selection; and (3) whether Owen's appellate counsel on direct appeal was ineffective for not arguing that the trial court erroneously allowed the State to cross-examine and improperly impeach Dr. Berlin on his personal views on the death penalty. Owen appealed to this Court.[13]

## II. DISCUSSION

### A. Standard of Review

Under § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant a state prisoner a writ of habeas corpus on a claim decided on the merits in state court unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1239 (11th Cir.

---

[13]This Court denied Owen's motion to expand the COA.

2010).[14] "We review de novo the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact." Reed, 593 F.3d at 1239 (quotation marks omitted).

## B.    Miranda and Owen's Confession

Owen argues, as he has done throughout, that the admission of his confession to murdering Karen Slattery violated Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  He contends that his two statements, "I'd rather not talk about it," and "I don't want to talk about it," were unequivocal invocations of his right to remain silent, and therefore the police officers' questioning should have stopped.

In Owen IV, the Florida Supreme Court held that the state trial court properly denied Owen's renewed motion to suppress because "Owen's statements were equivocal responses in context and under the circumstances presented."

---

[14]"A state court's decision is 'contrary to' federal law if the 'state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'"  Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 844 (11th Cir. 2011) (brackets omitted) (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000)).  A state court's decision involves an unreasonable application of federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. (quotation marks and brackets omitted) (quoting Williams, 529 U.S. at 413, 120 S. Ct. at 1523).

24

<u>Owen IV</u>, 862 So. 2d at 697.  After review, we readily conclude that the Florida Supreme Court's decision about Owen's confession was not contrary to or based on an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

In <u>Miranda</u>, the Supreme Court held that when a person questioned in police custody indicates that "he wishes to remain silent, the interrogation must cease." <u>Miranda</u>, 384 U.S. at 473–74, 86 S. Ct. at 1627.  However, a defendant who wishes to invoke his right to remain silent must do so "unambiguously" and "unequivocal[ly]."  <u>See</u> <u>Davis</u>, 512 U.S. at 458–62, 114 S. Ct. at 2355–57 (stating that a "suspect must unambiguously request counsel" and "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him"); <u>Berghuis v. Thompkins</u>, — U.S. —, 130 S. Ct. 2250, 2259–60 (noting <u>Davis</u> held that an ambiguous or equivocal invocation of <u>Miranda</u>'s right to counsel did not require police to stop questioning or to ask only clarifying questions, and determining that "there is no principled reason to adopt different standards for determining when an accused has invoked the <u>Miranda</u> right to remain silent and the <u>Miranda</u> right to counsel").

Under the facts here, and <u>Davis</u> alone,[15] it was not unreasonable for the Florida Supreme Court to conclude that Owen's confession was admissible because he did not unequivocally invoke his right to remain silent. It is undisputed that Owen was informed of his right to remain silent and understood that right and that he could invoke it at any time. Owen initiated many of the questioning sessions and admitted at the second suppression hearing that he wanted to speak to police. Owen repeatedly expressed a desire to confess to crimes of which he believed the police had enough evidence to convict him anyway.

As to the two statements—"I'd rather not talk about it" and "I don't want to talk about it"—both were made in response to questions about specific, discrete details of the crime, not general questions about the crime itself. Both times, Owen used the pronoun "it," which could have referred to the specific detail being asked about. The first time, Lt. Lincoln asked Owen, "Were you looking at that

_____

[15]We say <u>Davis</u> alone because the 1994 <u>Davis</u> decision predated the Florida Supreme Court's 2003 <u>Owen IV</u> decision. In contrast, <u>Thompkins</u>—which marked the U.S. Supreme Court's first enunciation of the principle that invocations of the right to remain silent (as opposed to the right to counsel) must be unambiguous—came years after the Florida Supreme Court's 2003 decision in <u>Owen IV</u>, and thus does not qualify as clearly established federal law for purposes of AEDPA. <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 660–61, 124 S. Ct. 2140, 2147 (2004) (stating that "clearly established Federal law" under AEDPA means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision" (quotation marks omitted)). Notably, <u>Thompkins</u>, like <u>Owen IV</u>, relied on the 1994 <u>Davis</u> decision, too.

26

particular house or just going through the neighborhood?" and Owen responded, "I'd rather not talk about it." Lincoln in turn responded, "Why? You don't have to tell me about the details if you don't want to [or] if you don't feel comfortable about that."[16] Owen continued speaking with the officers. Twenty-seven minutes passed, during which Owen continued his dialogue with the officers. Then Lt. Lincoln said Owen had a bicycle on the night of the Slattery murder and asked Owen where he put the bicycle. Owen responded, "I don't want to talk about it." Above we quoted the full context of the questioning, which demonstrates the "it" refers to the bicycle. Again, Owen continued speaking with the officers.

Based on the evidence presented in state court, it was not unreasonable for the Florida Supreme Court to conclude that Owen's two statements about not wanting to "talk about it"—which were isolated statements, made nearly 30 minutes apart, in response to questions about very specific details, in the midst of a give-and-take discussion of the evidence against Owen—did not constitute an

---

[16]Lincoln's responses to this statement and to Owen's later statement about not wanting to talk seem to indicate Lincoln had the subjective belief that Owen was—or at least may have been—only reticent to discuss certain details of the murder, not the murder in general. We recognize that Lincoln's subjective understanding of Owen's intention does not decide the issue, because the test for whether an invocation of a Miranda right is unequivocal is an objective one. But Lincoln's expression of the belief that Owen was referring only to certain details, and Owen's failure to correct him, is something that the Florida Supreme Court properly could have considered in determining whether under the totality of the circumstances Owen's statements were equivocal.

unequivocal invocation of Owen's right to remain silent.  An unequivocal and unambiguous invocation of the right to remain silent is one articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request" to exercise his right to remain silent and terminate the interrogation, not that it might be a request to remain silent.  Davis, 512 U.S. at 459, 114 S. Ct. at 2355 (emphasis added); see also United States v. Mikell, 102 F.3d 470, 477 (11th Cir. 1996) ("Pursuant to Davis, we hold that a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that he wishes the questioning to cease.").  Here, the state trial court could reasonably conclude that an officer in Lt. Lincoln and Officer Woods's place reasonably could believe that Owen's statements did not mean he wanted to invoke his right to remain silent.  The Florida Supreme Court's decision, affirming the denial of Owen's renewed motion to suppress, did not contravene or unreasonably apply clearly established United States Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence presented in

28

state court.[17]  Thus, Owen is not entitled to habeas relief on his Miranda claim.[18]

Nor is Owen entitled to relief on his claim that his confession should have been suppressed because it was involuntary.  The Florida Supreme Court twice held that Owen's confession to murdering Slattery was given voluntarily.  See Owen I, 560 So. 2d at 210 ("The tapes show that the confession was entirely voluntary under the fifth amendment and that no improper coercion was employed."); Owen IV, 862 So. 2d at 696 ("Owen was made fully aware of his constitutional rights, and knowingly and voluntarily confessed to the Slattery homicide on June 21, 1984. Clearly, based upon the evidence presented during the

---

[17]Owen argues he never received a full and fair hearing on whether he unequivocally invoked his right to remain silent because: (1) at the first suppression hearing, the equivocal versus unequivocal nature of Owen's invocation was not in issue; and (2) at the second suppression hearing, the state trial court believed it was bound by the Florida Supreme Court's earlier determination that Owen's statements were equivocal.

We reject this argument.  In Owen IV, the Florida Supreme Court found that, although the state trial court at the second suppression hearing could simply have relied upon the law of the case, the trial court in fact went further and permitted Owen to introduce new evidence and make new arguments, then made an "independent determination," which was supported by the evidence at the hearing, that Owen's statements were equivocal.  Owen IV, 862 So. 2d at 697–98.  This conclusion by the Florida Supreme Court was based on evidence and was not an unreasonable determination of the facts.

[18]Further, even if Owen's statements were not susceptible to two equally plausible different interpretations—and thus were not ambiguous or equivocal in fact—at the least we conclude that some fairminded jurists could believe the Florida Supreme Court was correct in finding them to be so.  That is all AEDPA requires to prohibit us from granting federal habeas relief.  See Harrington v. Richter, 562 U.S. —, 131 S. Ct. 770, 786 (2011) (observing that AEDPA bars federal habeas relief if "fairminded jurists could disagree" on the state court's merits determination).  At the very minimum, Owen's statements were arguably ambiguous or equivocal.

29

motion to suppress hearing, and the entire record of this case, Owen's confession was unquestionably voluntary. . . .").  The record shows that Owen wanted to speak with police, that he was repeatedly told that the officers could make no promises, and that he chose to confess because of the strength of the State's evidence and the fact he had already admitted to murdering Worden and "[i]t doesn't make no difference once you got one [murder conviction]."  The Florida Supreme Court's decision—that Owen's confession was voluntary—was not contrary to clearly established Supreme Court precedent, an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts.

**C.    Ineffective Assistance of Trial Counsel in Jury Selection**

1.    <u>Strickland</u> Test

Claims of ineffective assistance of counsel during jury selection are evaluated under the same standard as other ineffective assistance claims.  <u>Harvey v. Warden, Union Corr. Inst.</u>, 629 F.3d 1228, 1243 (11th Cir.), <u>cert. denied</u>, 132 S. Ct. 577 (2011).  The petitioner must show both (1) deficient performance by his trial counsel, and (2) prejudice resulting from the deficient performance.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

To establish deficient performance, Owen "must show that his counsel's

30

conduct fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place." Rose v. McNeil, 634 F.3d 1224, 1241 (11th Cir.) (quotation marks omitted), cert. denied, 132 S. Ct. 190 (2011). The performance prong "entails a deferential review of counsel's conduct," for "courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. "To overcome Strickland's presumption of reasonableness, [Owen] must show that no competent counsel would have taken the action that his counsel did take." Id. (quotation marks omitted). In other words, Owen must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [Owen] by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

To establish prejudice, Owen must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. —, 131 S. Ct. 770, 792 (2011).

2. State Court Denial

31

Owen claims his trial counsel were ineffective for not using a cause or peremptory challenge to remove jurors Knowles, Matousek, and Griffin. Specifically, Owen argues his counsel should have struck those jurors because: (1) two years before Owen's retrial, Knowles was the victim of a home invasion armed robbery in which her daughter was raped; (2) Matousek believed that under some circumstances, the death penalty should be applied in rape cases; (3) Matousek indicated on her questionnaire that whether the death penalty should be applied automatically "depends on the circumstances"; and (4) Griffin said she thought the death penalty should be imposed automatically when the defendant killed more than one person and that, in such cases, she would "[p]robably" vote for the death penalty.

The 3.851 court concluded that Owen had not shown either deficient performance or prejudice. The Florida Supreme Court affirmed. Owen V, 986 So. 2d at 549–50.

Specifically, the Florida Supreme Court found that the 3.851 court "did not err in denying this claim" because Owen failed to show that any of the three jurors were "actually biased." Id. The Florida Supreme Court observed that "[a] juror is competent if he or she can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by

32

the court." Id. at 549 (quotation marks omitted). "Therefore, actual bias means bias-in-fact that would prevent service as an impartial juror." Id. "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." Id. (quoting Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007)).[19]

The Florida Supreme Court further concluded that Owen's argument that his attorneys should have struck Knowles from the jury because her daughter was raped in a home invasion armed robbery was "without merit" because "Knowles'[s] responses during voir dire indicated that she would be able to lay aside any bias or prejudice and render her verdict solely upon the evidence

---

[19]As background, we note that to prevail on a motion to challenge a juror during the trial itself, Owen's trial attorneys would have had to demonstrate actual bias. See Busby v. State, 894 So. 2d 88, 95 (Fla. 2004) (noting that standard for granting cause challenge under Florida law is whether there is reasonable doubt "as to whether the juror possesses an impartial state of mind," which turns on "whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court"); id. at 100 (observing that "actual bias [is] the standard applicable to cause challenges").

However, to prevail on direct appeal on a claim that the trial court erroneously denied a cause challenge, Florida law requires that the defendant: (1) challenge the biased juror for cause; (2) if the challenge is denied, then use a peremptory strike on the actually biased juror; then (3) use all his other peremptory strikes; and (4) "show that an objectionable juror has served on the jury." Id. at 92, 96–97. An "objectionable juror" is one "who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted." Id. at 97 (quoting Trotter v. State, 576 So. 2d 691, 693 (Fla. 1991)). The defendant need not show the "objectionable juror" was actually biased. Id. at 100.

33

presented and the instructions on the law given to her by the court." Id. at 550

(quotation marks and brackets omitted). The Florida Supreme Court found that,

"[b]ased upon the totality of Knowles'[s] responses in her voir dire, Owen has not

shown [Knowles] to be actually biased." Id.

The Florida Supreme Court also concluded that Owen's claims about jurors

Matousek and Griffin lacked merit and that Owen had not shown any actual bias

as to Matousek and Griffin. Id. Specifically, "[t]he record demonstrates that

despite her personal viewpoint, juror Matousek stated a willingness and ability to

lay aside her possible bias and follow the trial court's instructions. Juror Matousek

never equivocated as to whether she could follow the law, and accordingly, Owen

has not shown her to be actually biased." Id. Similarly, "[w]hile Griffin answered

that she '[p]robably' would vote for the death penalty in the circumstance of

multiple victims and gave confusing answers regarding how she would consider

mitigating evidence, she ultimately stated that she would consider mental health

testimony and that such testimony could influence her toward a life sentence."[20]

Id.

_____

[20]The Florida Supreme Court further concluded that trial counsel also "did not act 'outside the broad range of reasonably competent performance under prevailing professional standards' by not objecting to" the judge's statement to Griffin that the trial would not involve more than one alleged victim. Id. at 550 n.12 (quoting Melton v. State, 949 So. 2d 994, 1001 (Fla. 2006)).

3.    Owen's Arguments

Owen argues that the Florida Supreme Court's denial of his jury-selection ineffective assistance claim was contrary to <u>Strickland</u> because Florida's actual-bias test is more onerous than <u>Strickland</u>'s prejudice prong, which requires a reasonable probability of a different result, not a plain showing of actual bias.[21]

Initially, we note that it is unclear whether the Florida Supreme Court in <u>Owen V</u> was addressing the deficient performance prong or only the prejudice prong of Owen's ineffective assistance claim.  In <u>Owen V</u>, the Florida Supreme Court never expressly stated whether its analysis related to performance, prejudice, or both.  On one hand, <u>Owen V</u> cited <u>Carratelli</u>, which addressed only the prejudice prong.

On the other hand, <u>Owen V</u> expressly found that the 3.851 court (which had expressly determined Owen's trial counsel's performance was not deficient) "did not err" in denying Owen's jury-selection ineffective assistance claim.  <u>Owen V</u>,

---

[21]Although the Florida Supreme Court did not cite <u>Strickland</u>, that does not strip the Florida Supreme Court's <u>Owen V</u> decision of the deference due it under AEDPA.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (stating that, under § 2254(d), a state court decision "does not require citation of our cases—indeed, it does not even require <u>awareness</u> of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them"); <u>Blankenship v. Hall</u>, 542 F.3d 1253, 1271 n.4 (11th Cir. 2008) (finding the fact "[t]hat the state court did not specifically mention <u>Strickland</u> is of no moment," for the "state court's failure to cite the relevant Supreme Court precedents does not mean that AEDPA deference does not apply").

35

986 So. 2d at 549.[22]  Further, the Florida Supreme Court's analysis in Owen V

speaks in terms of counsel's conduct, explicitly rejecting Owen's arguments that

his trial counsel "should have removed" Knowles, Matousek, and Griffin.  See id.

at 550 ("Owen argues that trial counsel should have removed juror Knowles . . . .

This argument is without merit. . . .  Next, Owen argues that trial counsel should

have removed . . . jurors Matousek and Griffin . . . .  This argument is without

merit.").  This language suggests the Florida Supreme Court was analyzing

Owen's trial counsel's performance.

Ultimately, we need not resolve this performance or prejudice question

because Owen, in any event, has not shown the Florida Supreme Court's decision

on either prong was unreasonable or contrary to clearly established federal law.

We explain why below.

4.      Performance Prong

As to the performance prong, Owen contends that no reasonable defense

attorney would have permitted Knowles to sit on the jury because her daughter's

rape in the home invasion was so traumatic and so similar to the facts of the

---

[22]The Supreme Court has suggested that even the ambiguity as to whether a state supreme court denied a habeas petitioner's claim on an alternative ground is enough to deny the claim under AEDPA, provided the possible alternative ground is a reasonable basis upon which to deny the petitioner's claim.  See Parker v. Matthews, 567 U.S. —, 132 S. Ct. 2148, 2151 (2012).

Slattery murder that Knowles could never consider Owen's insanity defense and mitigation case in an unbiased way. Owen, however, ignores Knowles's many other voir dire responses. For example, Knowles repeatedly insisted she could put the incident aside in deciding Owen's case. Defense counsel Haughwout questioned Knowles about the incident at length several times and candidly told Knowles she was "concern[ed]" about whether the incident would affect Knowles's view of the evidence and her decisionmaking. Knowles never equivocated on whether she could judge the evidence fairly. Knowles repeatedly assured trial counsel that she could put aside her own experience and decide the case fairly, on its own merits. Moreover, the home invasion crime occurred two years earlier and the perpetrator was caught and sentenced to 18 years' imprisonment, a sentence with which Knowles "was pleased."

Importantly too, Knowles gave many responses in voir dire that suggested she might be a very favorable juror from the defense perspective. Regarding the death penalty, Knowles said she did not believe it should be imposed automatically; she would want to hear the entire case before deciding on a penalty recommendation; and she could weigh the evidence and recommend life, if appropriate, even in a horrible case. Regarding an insanity defense, Knowles agreed that someone could be so mentally ill that he does not know what he is

doing. Knowles "would listen" and "weigh the evidence" on insanity. Knowles said that the possibility a defendant judged insane could be released in the future while still dangerous (a possibility that other potential jurors said concerned them) would not weigh on her mind while she was deciding the insanity issue.

In sum, Knowles answered all counsel's questions in a manner indicative of an unbiased juror. Indeed, Knowles's responses to the voir dire questions about critical issues such as the burden of proof, the non-automatic nature of the death penalty, the ability to be objective, and the ability to consider an insanity defense—exactly what Owen sought to prove—strongly suggested Knowles would be a capable juror. Owen had experienced defense counsel, who are "strongly presumed to have . . . made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. Based on these facts, Owen's trial counsel could have reasonably chosen not to strike Knowles from the jury. Thus, Owen has not shown deficient performance by his trial counsel in not striking Knowles and, therefore, Owen has not shown the Florida Supreme Court decision as to Knowles was unreasonable, much less contrary to clearly established federal law.

As for Matousek and Griffin, Owen claims his trial counsel were ineffective for not striking them because, he contends: (1) Matousek thought death should be

38

imposed for rape in some circumstances; (2) both Matousek and Griffin indicated they were in favor of automatic imposition of the death penalty; and (3) Griffin said she would "probably" vote for the death penalty regardless of what she heard if the defendant killed more than one person. Again, on the particular facts of this case, Owen has not shown deficient performance under Strickland as to Matousek and Griffin.

First, we consider the specific statements by Matousek and Griffin and their context. Matousek's statement on imposing the death penalty for rape came when she was asked for her personal opinion on whether the death penalty "should be applied to more crimes than murder." Matousek responded, "Not necessarily," but allowed that "[u]nder some circumstances, it could be rape." Next, defense counsel asked Matousek whether, given that Owen's case "involves a charge of first degree murder and sexual battery or rape," she thought that any penalty other than death would be appropriate. Matousek "thought it possibly could be[,] depending, as the judge has said, on the aggravating and/or mitigating circumstances."

On her questionnaire, which Matousek and the other jurors filled out before voir dire, Matousek had written "depends on the circumstances" in response to the questions whether the death penalty should be imposed automatically when the

39

defendant kills another person, or when the defendant kills more than one person. Asked at voir dire about the circumstances under which she thought the death penalty should be imposed automatically, Matousek answered, "I believe that if it was a premeditated murder and there were no mitigating circumstances at all, then it should be automatic."[23]

Griffin marked on her questionnaire, and explained at voir dire, that she felt the death penalty should be imposed automatically when the defendant kills more than one person. The State Attorney asked, "Does that mean if you felt that the defendant had killed four or five people, that [nothing] that you heard [] would convince you that anything other than the death penalty would be appropriate?" Griffin said no, that "it just depends."

Later, Griffin was asked again about automatic imposition of the death penalty, and Griffin said she would "[p]robably" vote for the death penalty if there were more than one victim killed. However, Griffin told the court she "could follow the law" and her opinion that in some cases a death sentence should be imposed automatically would not "take precedence over Florida law." She also

_____

[23]We point out that Matousek's statement about "automatic" imposition of the death penalty—in particular her reference to a complete lack of mitigating circumstances—could be reasonably construed to mean that Matousek was referring to the appropriate penalty when the result of a weighing process was obvious, not that she believed in a truly "automatic" imposition of the death penalty with no weighing to be done.

40

affirmatively said that she understood the death penalty was not automatic and that she would not have any problem engaging in the weighing process involved.

Thus, the important context is that: (1) Matousek's and Griffin's comments were made in response to questions about their personal opinions and beliefs about the death penalty; and (2) both jurors said more than once that they understood Florida law mandated a weighing process and not automatic imposition of the death penalty, and that they could follow Florida law.[24]

In addition, as with Knowles, both Matousek and Griffin gave responses that were favorable from the defense perspective, especially with regard to the insanity defense that Owen's counsel had chosen. Matousek believed it was right to consider whether someone was insane at the time of the offense as part of determining his guilt. Matousek explained:

> If a person who is living in the real world does something that is wrong, whether it's a terrible crime or not, then they should be punished for that. If the world they are living in is differ[ent] from my world and they don't know what they have done is wrong, then they should be held or given counseling, but they shouldn't necessarily be treated the same as the person who knew what they were doing.

If Matousek, after hearing all the evidence, did not know whether the defendant

---

[24]Griffin's other statements that show a lack of bias included: (1) her denial that she would invariably vote for death in a case where the defendant killed four or five people because "it just depends"; and (2) her repeated assertion, described later, that she understood the law mandated a weighing process instead of automatic imposition of the death penalty, and that she could follow the law in that regard.

was sane or insane at the time of the offense, she would "have to say not guilty by reason of insanity because that is the law." Matousek was okay with that.[25]

Similarly, Griffin had experience with psychologists and psychiatrists and was confident they knew what they were talking about. Insanity could be used as a defense, Griffin believed, "because sometimes people are insane when they commit horrible crimes." If Griffin had a reasonable doubt about whether the defendant was sane or insane at the time of the crime, Griffin would find him not guilty by reason of insanity. When told that was the law and asked if "that's the way the law ought to be," Griffin said yes.

Other favorable responses concerned the death penalty or the penalty phase process. Matousek stated that her attitude about the death penalty was "somewhere in the middle." Matousek was "not opposed in some cases" to imposing it, but there "certainly" were some circumstances in which life imprisonment was the appropriate penalty for first-degree murder. In considering the appropriate penalty, the defendant's background would be more important to Matousek than the nature of the crime. Matousek would want to know as much as possible about the defendant, and would "definitely" want to know about the

---

[25]In addition, Matousek thought most mental health experts were well-trained and well-meaning, and though they did not have "all the answers," no one did. It "would be maligning the profession" to say that all such experts gave the opinions they did just because they were paid to.

defendant's degree of mental illness.

Griffin characterized her feelings about the death penalty as neutral. She would rather not be on a jury that had to decide whether a person should receive the death penalty, and she feared having to make that decision, though she could be fair in making it. Griffin wanted to know anything that could help her make the decision, including mental health information. Testimony that the defendant had a mental illness would be important in the guilt and penalty phases, and such testimony would "[p]robably" make Griffin think the defendant deserved a life sentence rather than death.

Under the circumstances, Owen has not shown constitutionally deficient performance by his attorneys in not striking Matousek or Griffin. Both jurors insisted they could follow the law. A reasonable attorney in the position of Owen's counsel could have concluded that, on balance, Matousek and Griffin would be favorable jurors compared to other members of the venire. In particular, both Matousek and Griffin showed themselves to be receptive to mental health evidence in general, and an insanity defense in particular, which was defense counsel's chosen trial theory. Reasonable counsel could conclude, given the heinous nature of the Slattery murder and sexual assault, that picking jurors receptive to an insanity defense represented Owen's best chance to avoid the death

penalty. Reasonable counsel also could have concluded that jurors (like Matousek and Griffin) who were "middle of the road" or "neutral" about the death penalty, and who wanted to know as much as possible about the defendant's background in reaching a penalty-phase decision, would be beneficial to the defense.

Therefore, to the extent the Florida Supreme Court affirmed the denial of Owen's jury-selection ineffective assistance claim based on a finding of no deficient performance by trial counsel's not moving to strike the three jurors during trial, we conclude that finding was not contrary to Supreme Court precedent, did not unreasonably apply Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the state court evidence.

5.    Prejudice Prong

To the extent the Florida Supreme Court's denial of Owen's jury-selection ineffective assistance claim was limited to an analysis of the Strickland prejudice prong, Owen still is not entitled to relief.[26]  Carratelli's actual bias test is arguably consistent with Strickland.  To "show that there is a reasonable probability that,

_____

[26]The facts of Strickland are obviously distinguishable from Owen V, as Strickland did not concern a jury-selection ineffective assistance of counsel claim.  Indeed, Strickland did not involve a jury at all, for the petitioner, Washington, pled guilty and then waived his right to an advisory sentencing jury.  See Strickland, 466 U.S. at 672, 104 S. Ct. at 2056–57.

44

but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 694, 104 S. Ct. at 2068, Owen must show that at least one juror was biased; if no juror were biased, then there is no "reasonable probability that . . . the result of the proceeding would have been different." Id.

Ultimately, we need not decide whether the Carratelli actual-bias test for prejudice imposes a higher burden or contradicts the governing Strickland prejudice standard.[27] Even if the Carratelli prejudice test applied by the Florida Supreme Court in Owen V were contrary to Strickland, and thus our review were de novo, we conclude that Owen cannot prevail on his ineffective assistance claim.

We are wholly unpersuaded that there was a reasonable probability of a different result in either the guilt or penalty phases had Owen's attorneys removed these three jurors. All three jurors insisted—repeatedly and unequivocally—that they could follow the law, and all three jurors gave pro-defense responses to many

---

[27]See Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000) (stating that state court decision is "contrary to" Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]"); see also id. at 405–06, 120 S. Ct. at 1519 (noting further that "[t]he word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed,'" and giving example of a state court's rejection of ineffective assistance claim on prejudice grounds because "the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different").

questions. Moreover, there was no doubt that Owen committed the crime, which was almost inconceivably heinous and brutal. The presence of Knowles, Matousek, and Griffin on Owen's jury does not undermine our confidence in the outcome. See Rose, 634 F.3d at 1241–42 (noting that prejudice inquiry is "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and a "reasonable probability is a probability sufficient to undermine confidence in the outcome" (quotation marks and citations omitted)). Owen is not entitled to relief on his jury-selection ineffective assistance of counsel claim.[28]

## D. Ineffective Assistance of Appellate Counsel

Owen claims his post-retrial appellate counsel was ineffective for not raising on direct appeal the State's allegedly improper cross-examination, during the guilt phase, of Owen's mental health expert Dr. Berlin based on that expert's

---

[28]Owen also challenges, as ineffective assistance, three other omissions by his trial counsel during jury selection: (1) not objecting to the state trial court's statements to potential jurors that the mitigating circumstances would be "spelled out," when the state trial court had not decided whether to (and later decided not to) give the jurors specific instructions about the non-statutory mitigating circumstances defense counsel would present; (2) not objecting to the State's comment to a potential juror that an insanity defense could be raised whether or not it was valid; and (3) objecting and obtaining a curative instruction, but not moving to strike the entire jury panel, after the State asked a potential juror involved in prison ministry whether he had had contact with Owen in that capacity, thereby suggesting Owen was in prison. The State disputes whether these claims are within the scope of the COA. In any event, we conclude Owen has not shown that the Florida Supreme Court's denial of these allegations of ineffective assistance was contrary to clearly established federal law, an unreasonable application of such federal law, or based on an unreasonable determination of the facts in light of the state court evidence.

personal views on the death penalty.

Claims of ineffective appellate counsel are governed by the two-pronged Strickland test. Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009). As to performance, we must keep in mind that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue," for "an effective attorney will weed out weaker arguments, even though they may have merit." Id. As to prejudice, the question "is whether there was a reasonable probability that the appellate court . . . would have granted the petitioner a new trial" had the issue been raised. Ferrell v. Hall, 640 F.3d 1199, 1236 (11th Cir. 2011) (quotation marks and brackets omitted).

In denying this ineffective appellate counsel claim, the Florida Supreme Court found that, "even if the trial court erred in allowing the State to question Dr. Berlin regarding his personal beliefs on the death penalty, any error was harmless." Owen V, 986 So. 2d at 557. The Florida Supreme Court reasoned that: (1) "the State's questioning was not damaging to Dr. Berlin's testimony about Owen's sanity"; (2) Dr. Berlin answered the question professionally and his answer indicated he did not hold so strong a view on the death penalty that he was biased; (3) the State "did not dwell on the issue"; and (4) "three other mental health experts testified at the guilt phase about Owen's sanity." Id. Thus, the

Florida Supreme Court concluded, "it seems unlikely that knowledge of Dr. Berlin's view on the death penalty improperly influenced the jury's deliberation about Owen's defense. The issue would have been found to be without merit on direct appeal." Id.

After our own review of the record and Owen's arguments, we conclude that the Florida Supreme Court's denial of this claim was based on a reasonable determination of the facts in light of the record, and neither contravened nor unreasonably applied clearly established Supreme Court precedent. Owen is not entitled to relief.

## III.  CONCLUSION

We affirm the district court's denial of Owen's § 2254 petition.

**AFFIRMED.**